Burks, J.
On the 29th day of November, 1862, John Minor Botts and Franklin Stearns, of the city of Richmond, undertook to purchase from James A. Beckham, of the county of Culpeper, his valuable landed estate'in said county, containing by estimation about 1,940 acres, and also some personal property, at the gross price of $100,000 cash, payable in Confederate States treasury notes. The contract was in the form of a written proposition of Beckham, under his hand and seal, to sell, and a written acceptance under seal, signed by Botts for himself and Stearns, and is in these words:
“I now offer to sell to Messrs. Franklin Stearns and the Hon. John M. Botts my Auburn estate, more or less, by my deeds, including the detached woodland below Brandy, with all the stock of all kinds belonging to me on the estate, all the farming implements of all kinds, together with all the new corn in the *382 new corn-house, all the wheat in the stacks, and straw, a^ wlieat straw, corn, provender, fodder and on the farm as it now stands; also three negroes, viz: Spencer, Randall and John, for one hundred thousand dollars cash, in bankable funds, with the following reservations, viz : five choice hogs, the grain not enumerated above, one set of the blacksmith’s tools; and the said Stearns and Botts shall agree to purchase at valuation all of the furniture that I shall not desire to keep for my own use. The hay shall be estimated and- paid for at fifty cents per hundred, the fencing plank at seventy-five cents per hundred feet, and the locust posts at twelve-and a half cents apiece.
“ "Witness our hands and seals this 29th Kovember, 1862.
“ James A. Beckham, [l. s.]
“I accept the above proposition.
“ J. hi. Botts, for himself and
“ Franklin Stearns, [l. s.]
“Attest:
“ W. B. Ross,
“ 1). W. Kennedy.”
At the date of the contract Botts paid to Beckham, on account of the purchase-money for the property, forty-five thousand dollars in the check of Stearns on the Bank of Virginia, to his own order, endorsed by him to the order of Botts, and by the latter to the order of Beckham, for which payment he took the receipt of Beckham, signed by him, and endorsed on the contract- in the following words:
“ Culpeper County, November 29th, 1862.
“In confirmation of the within contract, I have this day received' the sum of forty-five thousand dollars *383 from the within named John M. Botts with the understanding that the balance of fifty-five thousand dollars is to he paid within the next ten days, on. delivery of the deed. '
“ J. A. Beckham.
“Attest:
“ W. B. Boss,
“ I). W. Kennedy.”
On the night of the third day of December following, James A. Beckham had a severe stroke of paralysis, which, for the time being at least, utterly prostrated him in body and mind. On the 10th day of the same month, Botts claims to have paid the fifty-five thousand dollars in the checks-of Stearns, and took from Beckham a deed conveying the Auburn estate, which was admitted to record in the county court of Culpeper on the 15th day of that month.
On or about the 20th of the same month, Beckham was removed to Culpeper Courthouse, and Botts and Stearns took possession of the Auburn estate, claiming title under the deed and contract aforesaid.
At the September rules, 1866, of the circuit court of Culpeper, J. Thomas Beckham, a son of the said James A., who, at the next preceding August term of the county court of said county, had by said court been appointed committee of the said James A., adjudged to he a person of unsound mind, filed his hill as such committee against Botts and Stearns, praying a rescission of the deed and contract aforesaid and a restoration of the Auburn estate upon the grounds that at the dates, respectively, of the deed and contract the said James A. Beckham was mentally incompetent to enter into, execute and bind himself by such instruments; that they were procured by the fraud, imposition and circumvention of the said Botts *384 for an illegal and grossly inadequate consideration, and were therefore null and void.
Botts and Stearns severally answered the bill, denying the alleged in competency of Beckham, the illegality and inadequacy of consideration of the contract and deed, and all matters of fraud charged in the bill, and insisting on the validity of their title under the deed.
Many depositions were taken on both sides, and the case being brought to a hearing on the 24th day of August, 1868, after being revived in the names of the administrator and heirs-at-law of James A. Beckham, who had died since the last term, the circuit court dismissed the complainant’s bill, declaring its opinion “that there was no fraud or undue influence in the procurement of the contract of the 29th November, 1862, in the bill mentioned; the consideration upon which it was founded was neither illegal nor in any legal or equitable sense inadequate; and that at the time of negotiating and signing the same the said James A. Beckham was neither insane nor in any sense of unsound mind, hut was capable in law of contracting; and the said contract must therefore he held valid and binding. As to the deed of the 10th December, 1862, also mentioned in the bill and’ proceedings, the court deems it unnecessary to decide upon its validity except so far as to declare, as it does, that there was no fraud in the procurement thereof; for if it be void because of the grantor’s mental incompetency at the time of executing the same, as to which the court expresses no opinion, still this court will not, under all the circumstances of the case, set aside the same, and thereby compel the defendants to sue for the legal title on a hill filed for the specific performance of the contract. Moreover, if the deed aforesaid he void in equity, for the reason mentioned, *385 it is equally so in law, and there was no necessity for the plaintiffs to have come into this court with the view of putting it out of their way in any proceeding they might have instituted at law in order to force the plaintiffs to their suit for specific performance.”
From this decree the Beckhams applied for and obtained an appeal from the district court of appeals, from which court the case was removed into this court for decision, and being heard here on the 25th day of November, 1875, this court pronounced the following decree:
“This day came again the parties by their counsel, and the court having maturely considered the transcript of the record of the decree aforesaid and arguments of counsel, is of opinion that the circuit court erred in not passing upon the validity of the deed of the 10th December, 18G2, in the bill and proceedings mentioned. That court, upon the evidence before it, ought to have declared such deed null and void. At the time of the pretended execution the grantor, James A. Beckham, was prostrated by an attack of almost total paralysis (having previously had three attacks of partial paralysis), and could neither speak nor write, nor could he move without assistance, and was utterly incapable, mentally and physically, of executing a deed or of entering into or consummating any important contract. The very ‘mark’ intended for a signature was made by another holding his dead and useless hand and guiding the pen so as only to make a cross-mark. A deed executed under such circumstances conveyed no title to the grantees, but is a mere nullity.
“The court is therefore of opinion that for this error the said decree he reversed and annulled, and that the appellants recover against the appellees their *386 costs by them expended in the prosecution of their appeal aforesaid here. And this court now proceeding to render such decree as the said court ought to have rendered, it is decreed and ordered that the deed bearing date the 10th day of December, 1862, purporting to have been executed by J ames A. B eckham, and purporting to convey to Franklin Stearns and John Minor Botts the tract of land in the bill and proceedings mentioned, known as ‘Auburn,’ be and the same is hereby declared to he null and void. And it is further decreed and ordered that the appellees, •or those claiming under them, who may be in possession of said land, shall surrender the same to the appellants unless within ninety days from the entry of this decree the said Franklin Stearns and the heirs or devisees of the said John Minor Botts shall file their bill in the said circuit court of Culpeper county for the specific performance of the contract in the hill and proceedings mentioned, bearing date Novemb'er 29th, 1862. And it is further decreed and ordered, that during the progress of such suit for the specific performance, and until its final determination, the said appellees shall not be disturbed in their possession of said land by any proceedings at law on the part of the appellants, or those claiming under them, to recover said possession.”
After the cause had been remanded under this decree, Stearns and the heirs of Botts, who had died after the date of the decree appealed from, filed their bill for specific performance within the time prescribed by the decree, alleging that the contract of the 29th of November, 1862, had in all respects been fully performed on the part of Stearns and Botts, and praying a conveyance of the legal title to “Auburn.” Referring to the payment of the $55,000 in checks, they did not expressly and directly allege confirmation, but *387 rather inferentially by averring “ that whatever may have been the temporary condition of the said James A. Beckham on the 10th day of December, 1862, in mind and body, he in a short while thereafter sufficiently recovered both his physical and mental vigor to attend to large and important business transactions ; that he endorsed or caused to be endorsed the said checks for $55,000, and invested the proceeds.”
The defendants answered the bill, setting up as defence substantially the same matters which had been relied on by them in the bill filed for the rescission of the deed and contract, and as to the alleged payment of the $55,000, 'averring that at the time the checks therefor were delivered by Botts the said James A, Beckham ivas mentally incompetent to consummate the contract of the 29th November, 1862; and in response to allegations in the bill, denying that after the 10tli day of December, 1862, ho ever recovered to a considerable extent his physical health, or that his mind was 'at any time thereafter sound and discriminating, or that he ever negotiated any of the checks passed to him as a pretended payment for Auburn, or that he ever invested the proceeds thereof, or that he ever did endorse said checks to any one, or that he ever authorized any one to endorse them for him, or that he was at any time after the 10th day of December, 1862, able to look after his interests. They denied that the said James A. Beckham, after this time, had ever ratified and confirmed, or was capable of understanding or ratifying anything that had been done for him. On the contrary, they averred that after the 10th day of December, 1862, he was an utter Imbecile, a child in helplessness and understanding, and never able to communicate, except in most simple and uncertain fashion, his own views or wishes. They further insisted that if there was any ratification or *388 confirmation of the alleged payment of the $55,000, ^ might and should have been shown and established way of defence in the suit which was brought for -the rescission of the deed and contract, and that the -complainants were estopped by the decree aforesaid of .this court in the determined suit from showing such ratification or confirmation in the present suit.
A great mass of testimony was taken, which, together with the record of the former suit of Beckham & others v. Botts & others, agreed to be read and considered as evidence in the cause, makes a printed record of five hundred pages. "When ready, the cause was heard before the Hon. G. A. Wingfield, holding a special term of the circuit court of Culpeper county, on the 12th day of June, 1877, when the learned judge, for reasons stated in a written opinion filed with the record, dismissed the bill of the complain■ant-s at their costs, and ordered them to deliver up and surrender the possession of the lands in the bill ■and proceedings mentioned to the defendants; the decree to be without prejudice to the right of the plaintiffs to institute any suit or action on the con- ■ tract of the 29th November, 1862, which they may be •advised to bring.
Whether there be any error in this decree, from which an appeal has been allowed the complainants, this court has now to determine. '
The rule, that it is as much a matter of course for courts of equity to decree specific performance of a contract for the sale of real estate as it is for courts of law to give damages for a breach of such contract is true only when the contract is in its nature and circumstances .free from objections. The sufficiency or insufficiency of the objections in any case must be determined by the court in the exercise of a power involving discretion; for it is a principle in equity jurisprudence, settled by a *389 long course of decision, that a decree for specific performance is not a matter of absolute right, but one resting in judicial discretion; not indeed an arbitrary capricious discretion, dependent upon the mere pleasure of the judge, but a sound and reasonable discretion, which governs itself, as far as it may, by general rules and principles; but, at the same time, which withholds or grants relief, according to the circumstances of each particular case, when these rules and principles will not furnish any exact measure of justice between the parties. 1 Story’s Eq. Juris. § 742, and authorities there cited, § 693; Kerr on Fraud and Mistake, 357; King v. Hamilton, 4 Pet. R. 311; Willard v. Tayloe, 8 Wall. U. S. R. 557; Anthony v. Leftwich, 3 Rand. 238, 245, 261; Miss. & Mo. R. Road Co. v. Cromwell, 1 Otto U. S. R. 643. While no positive rule can be laid down to govern the court in all cases in which it is called upon to exercise this extraordinary jurisdiction, yet it may be safely said that in no case will the court lend its aid to enforce a contract in the procurement or execution of which fraud or imposition has been practised by.the party seeking the relief, or undue influence exerted, or undue advantage taken. An agreement, to be entitled to be carried into specific performance, ought to be certain, fair and just in all its parts. 1 Story’s Eq. § 769; 2 Rob. Prac. (old ed.) 170.
A man who calls for specific performance must be able to show that his conduct has been clear, honorable and fair. It is a principle in equity that the court must see its way very clearly before it will decree specific performance, and that it must be satisfied as to the integrity and good faith of the party seeking its interference. Kerr on Fraud and Mistake, 358.
The unfairness, which will disentitle a plaintiff" to call for specific performance at the hands of a court of equity, may be either in the terms of the contract itself or it *390 may be in matters extrinsic and the circumstances under which it was made. The unfairness need not amount to fraud; for there are many instances in which, though there is nothing that actually amounts to fraud, there is nevertheless a want of that equality and fairness in the contract which are essential in order that the court may exercise its extraordinary jurisdiction in specific performance; and in judging of thp unfairness the court will look not merely at the terms of the agreement, but at all the surrounding circumstances, such as the mental incapacity of the parties, though falling short of insanity, their age or poverty, the manner in which the agreement ■was executed, and the like; and whenever there are evidences of distress in the party against whom performance is sought, or he was an illiterate person, or whenever there are any circumstances of surprise, or want of advice, or anything which seems to import that there was not a full, entire and intelligent consent to the contract, the court is extremely cautious in carrying it into effect;. and where the parties contracting are on unequal terms, the onus of proof rests on the party who seeks to uphold the contract to show that the other performed the act or entered into the transaction voluntarily and deliberately, knowing its nature and effect, and that his consent to perform the act or become a party to the transaction was not obtained by reason of any undue advantage taken, or of any undue influence exerted over him. Kerr on Fraud and Mistake, 190; Fry on Specific Perform. §§ 233, 234, 239, 240, 241; Twining v. Morrice, 2 Bro. C. C. 326; Mortlock v. Buller, 10 Ves. R. 292, 305.
Whatever may have been the doctrine of the earlier cases, it seems now to be the settled rule of the English chancery, that inadequacy of consideration, unconnected with any other circumstance, constitutes no valid objection to the specific execution of a contract through the medium of a court of equity unless the inadequacy be *391 so great as in itself to be sufficient evidence of fraud. To give it this effect it must be so gross, as Lord Thur-low has observed, that “ it is impossible to state it to man of common sense without producing an exclamation at the inequality of it,” (Gwine v. Heaton, 1 Bro. C. C. 8,) or, as it is generally stated, sufficient to shock the conscience; “ a principle loose enough,” as remarked by Lord Eldon, “but one by which judges in equity have felt themselves bound, and to act upon occasionally for the safety of mankind.” Gibson v. Jeyes, 6 Ves. R. 273.
While, however, it may not alone be sufficient to warrant the court in the rescission of a contract or in refusing to execute it, it has an important bearing in either case, in connection with other circumstances, in determining the question of fraud or unfairness. The English rule has been followed by this court in several recent cases. Hale v. Wilkinson, 21 Gratt. 75; Talley v. Robinson's ass'ee, 22 Gratt. 888; Ambrouse's heirs v. Keller, 22 Gratt. 769; White & wife v. McGannon & als., 29 Gratt. 511.
The price stipulated by the contract of 29th November, 1862, to be paid for Auburn, was not so grossly inadequate as of itself to be conclusive evidence of fraud. I attach but little weight to the rather conjectural statements by the witness Wood of the prices paid by James A. Beckham for the several parcels constituting the estate, but it appears by the record that it was assessed for taxes in the year 1861 at $40,597. This was most probably less than its value, as lands in this commonwealth are generally assessed for taxation at much less than they would bring in the market. The value at the commencement of the war, as estimated by the witnesses, ranges from $60,000 to $90,000. Confederate money, in November and December, 1862, according to the evidence, was depreciated, as compared with gold coin, in the proportion of 2 to 3 of that currency to 1 of *392 gold. According to this standard, after making a reasonable deduction for the personal .property included in the sale, the price for the land was upwards,,of $30,000 in gold coin. This is about one-third of the value of the land at the commencement of the war, as estimated by some of the witnesses. But the land was not sold for gold coin, but for Confederate money, and, as was said in Hale v. Wilkinson, supra, “it could only have been sold for that kind of money, such being then the only currency of the country. Confederate money had a purchasing power, in regard to land and other property, which made it worth much more than its market value in gold with the brokers.” It is shown by the evidence in this ease that the $100,000 in Confederate money paid for Auburn and the personal property sold with it wopld have bought “Farley,” a landed estate in the same vicinity, then on the market, estimated by most of the witnesses to be more valuable than Auburn, and afterwards -actually purchased.by Mr. Stearns for that sum. In Hale v. Wilkinson, the price paid for the land, which was the subject of controversy, was $10,000 in Confederate money. The land was estimated to be worth at the time of sale and since the war $6,000 in gold, and the value of the Confederate money when paid was in gold $385; and yet this court affirmed the decree of the circuit court, carrying the contract into execution by directing the conveyance of the legal title to the purchasers, there being no other objection to specific performance than the alleged inadequacy of consideration. Upon the authority of that case and similar cases since decided by this court, if the alleged inadequacy of price was the only objection raised to the execution of the contract in this case, it could not, I think, avail.
The bulk of the evidence in the case relates to the condition, mental and physical, of James A. Beckham, *393 and the circumstances attending the negotiation for the sale and the execution of the contract and deed. Possessed. by nature of a sound physical constitution and vigorous mind, although entering life poor, by his great energy and industry, sound judgment and good manage-' ment, Mr. Beckham, at middle age, had acquired the Auburn estate and much valuable personal property. He was the owner, at the commencement of the war, of a large number of slaves, between twenty and thirty of whom, according to the testimony of his daughter, were laborers on his farm. Most of these escaped to the enemy during the war, and property in the residue, together with the greater part of the proceeds of the sale of Auburn, invested in Confederate securities, perished in the wreck of the Confederate government; he died in poverty in the year 1868, a little upwards of sixty years of age. He had a stroke oí paralysis in the year 1855, another in 1856, a third, it would seem, in August or September, 1862, and a fourth and the last on the thii’d day of December in the same year. The first attack produced entire paralysis of the right side, and confined him to. his bed for a month or moye. When sufficiently recovered to travel,he visited the Hot Springs, remained there for six or eight weeks, and when he returned was able to walk with a crutch and cane, and afterwards with his cane alone. Paralysis of the entire left side resulted from the second attack; his mouth was drawn to one side, and his left eye is described as a little dull and drawn. It does not appear how long he was confined by this attack; he recovered, however, sufficiently to be able to ride about and attend generally to ordinary business. lie managed his own farm with the assistance of an overseer and first one and then another of his oldest sons.
*394 Col. John S. Mosby, who remained at his house a week or ten days in November, 1862, thus describes his physical condition then : “ He was very feeble. My recollection is, that at that time he was suffering from the effects of a paralytic stroke he had had before; he was on one or two crutches; he seemed to be the wreck of a man who had been once of a robust constitution.”
Dr. George Eoss saw him in September, 1862, after his third attack, and thus describes his condition at that time : “ He was suffering from paralysis of the entire left side; he articulated indistinctly, his features were distorted, he was unable to grasp anything with his left hand, and dragged his left leg heavily. He was hobbling, when I saw him, on two crutches, in the hall of his house; had his left wrist bound to the crutch with a red silk handkerchief, and it coming loose, I retied it myself.”
So much as to his physical condition previous to the 29th day of November, 1862 (the date of the contract), and the third day of December (the same year), the date of the last attack of paralysis.
The evidence as to his mental condition during this period is very conflicting. Many witnesses who had known him before his first attack of paralysis, and observed him afterwards, give it as their opinion that while the disease affected his locomotion to a limited extent, it did not at all impair his mental faculties, so far as they could discern, and that he was as capable of transacting business as he had ever been.
On the other hand, numerous witnesses of intelligence testify to the enfeebled condition of his mind and his want of capacity to contract. Amongst these is Dr. Clement E. Harris, whose testimony, I think, is entitled to great weight in this case.
He was the family physician of Mr. Beckham from March, 1857, to April, 1862. After stating that Mr. *395 Beckham had been paralyzed some years before he knew him; that the paralysis was complete in one-half of his body, essentially impairing his gait, and, as a consequence, that his digestive organs were feeble, resulting in such condition as'to require frequent treatment to prevent threatened recurrence of an attack- of apoplexy, he says “ his temper and disposition were irascible, and frequently he would not transact business of any kind which would tax in the least his intellectual powers. I did a large practice in his family. He always carried out and saw my prescriptions given until 1860-61, and part of 1862, when I noticed such a marked failure in his memory as to induce me to place them in other hands. I rarely had any business transactions with him, outside of my professional engagements, until the spring of 1862, when I detected increasing failure in his memory. In 1862 I considered him as laboring under marked dementia, or the enfeeblement of intellectual power, the I’esult of his disease. * * * In the month of April, 1862, in passing his house with my negroes and stock as refugee, I found his mind greatly disturbed, and his nervous system in an extreme condition of superexcitation and mobility, and with his memory at that time so much impaired, that I deferred a matter of business with him lest I might induce unpleasant and serious results. * * * His disease unquestionably had a tendency to affect his mind, and any repetition of his attacks would evidently impair his mental faculties to an increased extent. # * * I cannot say that I would have deemed him incompetent to make a contract prior to my leaving the county, although I had seen but little of him for a few months prior to my departure, except the morning I passed his house, at which time I should not have thought him competent.”
Hr. Edward L. Wager, who had practised medicine in Beckham’s family with Hr. Harris, and also after Harris *396 left in 1862, says: “I consider that he had changed very materially since my former association with him. He had been paralyzed in the mean time, and was suffering a good deal of nervous excitability. I thought his mental condition sympathized a good deal with his physical condition of impairment of health. * * * Such being the great nervous and mental excitability in which he was at that time, that I considered him hardly qualified to transact any grave and 'important business. I have frequently expressed my opinion to his and my friends that he was not competent to transact business about so grave a matter as the sale of his property.”
' It appears that Mr. Beckham was naturally quick-tempered, but after his first and second attack of paralysis he became much more irritable and excitable, and his harsh treatment of his only daughter, the particulars of which are detailed in the evidence, caused her to leave his house in December, 1861, to which she never returned until after his last attack of paralysis, in December, 1862. This unnatural conduct on his part is attributed by the appellants to his violent opposition to the marriage of his daughter with Dr. Boss, to whom she was engaged—an opposition based, it would seem, not so much on any dislike he had for Dr. Boss as on the apprehension and distrust engendered by the bad moral character of Dr. Boss’ father, William B. Boss, who figures so conspicuously in this record. But it is proved that this bad treatment of his daughter commenced before her engagement to marry, and that his demeanor towards all his ehiiden was changed. “ Previously,” says Mr. Alcocke, his brother-in-law, “ his conduct and demeanor to his daughter, and to all his children, was indulgent, kind and considerate. I think about the time of the difficulty with his daughter, his manner to all his children was considerably changed, he being much more harsh, fault-finding and cross to them.”
*397 Ilis unkind treatment, apparently \yithout cause, of his nieces Mary S. Gwin and Ella Gwin, while staying at his house in 1861 and 1862, is described in their depositions.
Ilis excitability was no doubt aggravated by the too free indulgence in the use of ardent spirits, and further by the incursions, actual and threatened, of the Federal army, of which, although once a man of firmness, to use the language of one of the witnesses, “ he had a mortal dread.”
It has been seen that Dr. Harris stated that “ any repetition of his attacks would evidently impair his mental faculties to an increased extent.” Several witnesses speak of his mental condition in November, 1862, after his attack in August or September of that year. At the risk of being thought tedious, I select and transcribe what is said by Col. John S. Mosby, a gentleman of intelligence and observation. He staid at Mr. Beckham’s house for two weeks in March, 1862, and a week or ten days in November, 1862. Referring to the last-mentioned period, after speaking of his feeble condition, physically, in the terms before stated, he says: “I think his intellectual condition was as feeble as his physical, compared with himself in the spring of 1862. It was evident to me die was rapidly becoming an imbecile; that he was in such a condition of mind as to make a judicious disposition of property, or to make a sale, I do not think; at the same time I do not think he was absolutely non compos. Ilis mind was often lucid. Then he spoke sensibly about the condition of affairs. At other times his mind was wandering,'and his conversation was loose and incoherent.” * # # “-I did not think him a man of sufficient discretion to be entrusted with the management and disposition of such an estate, but whether it had reached such a degree of imbecility as to produce an absolute legal incapacity to contract, I can *398 not say at this distance of time, but the inclination of my mind now is in favor of the opinion that at the time he did not have the capacity to contract.” * * * “Of course, being in his house the length of time I was, I had a good deal of conversation with him, especially as he staid generally in the room with me. He was generally very childish in his talk; he was often very sensible and practical. I think he suffered a good deal from his physical condition. His intellectual condition seemed to be a good deal dependent on his physical condition.” * * * «I think his condition in November, 1862, whilst it did not reach the point of idiocy or lunacy, was far below the average intelligence of men. There were symptoms of what had been a strong intellect, but which had become greatly impaired and enfeebled.”
Thomas W. Parr, who saw him in September or October, 1862, says: “I went to see him at his instance, to transact some business for himself. When I reached his house I found him sitting in the porch, and he seemed to be in low spirits, hardly recognized me, and seemed not to know that he had sent for me. I began to talk with him about the business he had sent for me to transact, which was to sell some mules and colts he had. His notion about the prices of the stock was absurd. He commenced fretting in such a manner as to cause me to leave him, and I remarked to a gentleman who was with me that I thought Mr. Beckham crazy. * * * The general impression left upon my mind was that he was incapacitated for business. He talked in a rambling way about the stock—about their bringing very large prices—some young mules and colts. He was not trying to sell me the stock; he wanted me to take them off to some place of safety and sell them for him. * * * I found him looking feeble and haggard, resembling a man worn down by disease. I was astonished to find him so irritable and cross.”
*399 After a careful examination of all the evidence, although I am not prepared to say that on the 29th day of November, 1862, James A. Beckham had not city sufficient to make any valid contract, yet I do say that any man who dealt with him in his then condition, mental and physical, dealt' at his own peril; and that ■when a transaction which involved the disposition of nearly his whole estate, and an estate of such magnitude as his, is drawn in question, a court of equity will scrutinize very closely every fact and circumstance connected with it.
This brings me to the consideration of the negotiations for the sale and the circumstances attending the execution of the contract of the 29th of November.
It is very clear to my mind that a short time before the sale' Beckham had no purpose of selling. In the early part of November, Botts and Stearns, who were engaged in the purchase of lands for Confederate money, they having no confidence in that currency, visited the counties of Orange and Culpeper, where they had been informed there was a large quantity of valuable landed property for sale. After getting to Gordonsville they formed the acquaintance of Mr. William B. Boss, who informed them, as Mr. Stearns says in his answer, that he was authorized to sell several farms, amongst others the “Farley” estate, and invited them to go and examine it. By agreement they subsequently met at Culpeper Courthouse, proceeded to visit Farley, and at Boss’ invitation stopped at Beckham’s, where they staid two nights and part of a day during the time they were examining the Farley estate. “ At that time,” says Mr. Botts in his answer, “Mr. Beckham’s property was not in the market,.did not attract special observation, and not one word was exchanged and not one thought expended upon its purchase, as far as your respondent knows or believes.” In this statement Mr. Stearns, in *400 his answer, substantially concurs, and Ross, in his deposition, says: “It was not in the market at that time, nor • did I or either of those gentlemen (Botts and Stearns), as far as I know, expect it to be; it was a subsequent determination of Mr. Beckham’s, made known to me by him after they had returned to Richmond and home.” The exact date of this visit is not proved, but it may be approximated with reasonable certainty from what is proved. Two of the checks used in the payment for Auburn are dated 4th November. They were no doubt drawn and dated when Botts and Stearns left Richmond on the visit before spoken of, with the intention of using them in such purchases as they might make. Making due allowance for travel, it could not have been earlier than the 6th or 7th of the month, and it was probably later, w-hen they left Beckham’s on their return home. “About two weeks after this,” says Mr. Stearns in his answer, “Mr. W. B. Ross called at his (respondent’s) office, and as the agent of 'Mr. James A. Beckham offered to sell him the Auburn farm, with its stock, implements and crops, for ¡¡>100,000.” Now, from the great eagerness of Ross to make the sale, as shown by the record, there can be no doubt that as soon as he undertook this agency he went at once to Richmond to effect the sale. This must have been between the 20th and 27th of the month, a few days only before the contract was executed; for, as soon as the proposition was made, Botts -left Richmond with Ross, reached Beckham’s on the night of the 28th, and the contract was signed next day (29th).
Several witnesses depose to having heard Beckham speak of an intention to sell his land; but on examination of their statements it will he found that all may be referred to the negotiations opened by Ross after the visit of Botts -and Stearns to Farley, except the statements of one George Turner, who professes to have *401 heard Mr. Beckham in September (1862) express a desire to sell his land, and says that he offered to sell it to him, but he did not have money enough to entertain the proposition. This Mr. Turner, it seems, was merely passing through the country and stopped awhile at Mr. Beckham’s in company with Mr. T. T. Gwin, Beckham’s nephew. Gwin heard nothing of this conversation. Turner says he never mentioned it to him, and it seems incredible that it ever should have occurred; for, if Beckham had really entertained any wish to sell his land, is it to be supposed that he would not have mentioned it, or that Boss would not have mentioned it for him afterwards to Botts and Stearns, who were looking out for lands, and able to buy them, when they staid at Beckham’s two nights and a day in November ? Most of Mr. Beckham’s friends and relatives, with whom he would be likely to confer, were either in the army or.had removed from the county temporarily to places of safety. Coleman C. Beckham, his cousin, a near neighbor, with whom he was most intimate, left the county in the spring of the year 1862, and was in Lynchburg at the time of the last attack of paralysis. Being written for, he came, and was present when the deed was signed and attested it. He had never heard of Beckham’s intention to sell until after the sale was made. Charles II. "Wager, another relative and near neighbor, a soldier in the army, was at home from 29th September until after 29th November. He was in the habit for some years of writing letters and making off accounts for Mr. Beckham, and it was the habit of Beckham to confer with hiln about his written contracts, deeds, &c., before executing them. He says he was not consulted about the sale, nor did he know that Beckham desired to sell his farm until after the sale. Only one of Mr. Beckham’s sons was at home, and he a boy in the sixteenth year of age. He says that he heard *402 no talk of the sale of Auburn, and does not remember ever to have heard his father speak, of it until after Ross came back from Richmond. Thomas S. Aleocke, the brother-in-law of Beckham, who lived at Culpeper Courthouse, a few miles distant, and who had more to do in the absence of others, during the war at least, with .the business transactions of Beckham, and was oftener consulted than any one else, speaks of having been sent for by Beckham before he sold his farm, and the sale was the subject of conversation. His statements are somewhat confused as to his going to and returning from Beckham’s each day, but I think he has reference to the periods commencing with the arrival of Botts on the 28th November; for he distinctly states that he did not know that Beckham intended selling until he was informed that Ross had authority from Beckham to look for a purchaser, and had brought Botts up to look at the farm, &e. He says that he did not advise Beckham to sell, and does not remember that Beckham ever sought his advise on the subject before Botts came to purchase the land. "Who, then, did advise Beckham to sell, and how -was the sale, never before contemplated, brought about? The record, I think, furnishes a satisfactory answer.
Ross, in his deposition, says: “Mr. Stearns and Mr. Botts, accompanied by myself, went to Farley, and after an examination they expressed themselves rather disappointed, or not so much pleased as perhaps they were led to believe they would have been; said it was very hilly or broken, and that they both liked the Auburn estate better at the same frite; and afterwards, when I had both on the market and offered the same to them, they evinced their sincerity in the opinion they both advanced (contrary to my own, as expressed,) by purchasing the Beckham property.” Stearns also purchased Farley very soon after the purchase of Auburn.
*403 Here, then, was an expression by Botts and Stearns to Eoss, the laijd agent, of a preference for Auburn over Farley, at the same price, when Auburn was known by all parties .not to be on the market. After Botts and Stearns left Beckham’s, Eoss is found at Beckham’s soliciting him to sell. Mr. Lemuel A. Corbin was also present. He says: “Mr. Eoss told me he was at Mr. Beckham’s for the purpose of getting him to sell his farm, and he told me he was offered some sum, I don’t -remember the amount, but it seems to me it ioa.s over a hundred thousand dollars, and requested me to advise Mr. Beck-ham to sell his farm. This request was not in the presence of Mr. Beckham. I did not tell him whether I would or not'advise Mr. Beckham. Afterwards he named the matter to Mr. Beckham in my presence, and appealed to me to know if, in my opinion, Mr. Beck-ham ought not to sell. I replied to him that if I owned such a1’ farm as Mr. Beckham’s I could not be induced to sell it for Confederate money. That was about the amount that "was said of the sale in my presence. After I declined to advise Mr. Beckham to sell, Mr. Eoss said nothing further about it.” The witness, being asked whether Mr. Beckham indicated in any way a response to this application, said: “I don’t remember exactly the response. Mr. Beckham seemed unwilling to sell Ms land at that time, and was remarking continually ‘I am a ruined man, ruined man.’
Thus it seems William B. Eoss had an offer from some source for the purchase of Auburn before its proprietor had ever been consulted- about it, and he set himself to work to induce a sale, and endeavored to get others to assist him in his undertaking. He failed at first, but as soon as that “ subsequent determination ” of Beckham to sell, of which he speaks, was made known to him by Beckham, he went to Eichmond, professing to be clothed with an agency, and offered the property *404 to Botts and Stearns, and it does not appear by the record that he ever offered it to any other persons. The offer resulted in an agreement that Botts should accompany Ross to Culpeper and examine the property with a view to decide whether to accept or reject the offer. He did accompany him, and the two reached Auburn on the night of the 28th of November. On the next day (29th), Saturday of the week, Botts examined the land, but “ partially,” as Ross says, and then negotiations for the sale were commenced. Besides Botts and Beckham, the following persons were present, to-wit: William B. Ross, Daniel W. Kennedy, John Gf. Beckham (son of James A. Beckham), and Thomas S. Alcocke, (Beck-ham’s brother-in-law,) who had been sent for by Beck-ham, it would seem, on that morning. In one of his depositions, John G-. Beckham says that he thinks his brothers, Beverly and Camp, were also present, but that neither he nor they were advised with. The depositions of Ross, Kennedy, Alcocke and John Gf. Beckham were taken, and show what occurred.
According to Ross’ statement, the proposition or offer to sell to Botts and Stearns included the Auburn estate and “ all the crops, stock, farming implements, &c., then on the estate.” The negotiation was commenced by objections on the part of Beckham, which will be best understood by transcribing parts of Ross’ deposition, questions and answers relating to the subject.
He was examined by the plaintiffs, and in answer to a question propounded by their counsel, said:
“ Mr. Beckham said that I had misapprehended his proposition, and transcended his authority in including all of the crops, when he intended half of the wheat to be included in the sale, and I consented that to that extent my commission should be abated.
“ Question. Try and recollect if any other objection - was made during the conversation ?
*405 “ Answer. I think Mr. Beckham did also claim to reserve some corn; I do not recollect how much, and I am under the impression Mr. Botts yielded in that, as also in the claim to reserve some few other things, perhaps a lot of posts and sawed lumber, &c.
“ Question. Bo you remember any objection raised by Mr. Beckham to any threshed or clean wheat; if so, state it ?
■ “Answer. I am of the opinion now something was said ábout a machine, and perhaps clean wheat; the particulars, or how settled or disposed of, I do not recollect.
“ Question. Bo you know of any objection raised by Mr. Beckham about any hogs or hay being included in the sale; if so, state it ?
“ Answer. My recollection of what passed on the subject of hay or hogs is indistinct; I think Mr. Beckham did claim a part of the hogs, what part, or all, if so, I do not recollect with certainty.”
After these objections had been disposed of, Beckham raised other objections and still refused to enter into the contract. What ensued will be best stated in Ross’ own language:
“I contended that the offer to Mr. Botts and Mr. Stearns was with his (Mr. Beckham’s) authority; that it included only w'hat he had told me; he adhered to his objection and would not otherwise consent to ratify the contract. I finally agreed that half of the crop of wheat, probably something (else) he contended for, should be valued and deducted from my commission. This, or something near it, was finally agreed on, when he proposed something else, I do not now remember what precisely, should be put in and deducted from my commission, to which I demurred. I think (I) got in a pet and started out in the porch, saying if he did not then confirm the xmderstanding and contract I should not come in his house *406 again; he, or some one for him, called me back and he complied.”
It was then, I suppose, that the contract which was finally signed was written. It was written by Ross, in the presence of Botts and Beckham, as Ross states, and according to what he understood the final agreement to be. But before Beckham “ complied ” and signed the agreement, according to the testimony of Kennedy, there wrere other occurrences of much importance, as will appear by the following questions and answers taken from his deposition:
“ Question. State all that occurred on the day that the contract was signed, so far as you can now remember ?
“Answer. So much occurred on that day, it is hard for me to tell where to commence. They were chaffering and disputing all d,ay long, and sometimes quarrel-ling, and I thought at one time that the whole thing was broken up; Col. Ross contending that he had authorized him to sell, Beckham saying he had misrepresented him, and refused to sign the contract. Botts and.\ Boss continued to urge him, and they finally told him that it toas reported that the Yankees had crossed the-river and would soon be there, (that) that mould knock everything in the head, and he might lose everything he had, and if he wanted to trade, that was the moment. After this was-brought to bear on him, he was made to believe that it loas the best thing he could do, and finally said ‘ let it go? and signed the contract. He ivas very much excited at the time—seemed not to know whether he was doing right or wrong; and it is my judgment he would not have sold his land but for the influence brought to bear on him.
“ Question. State whether at the time he signed the contract James A. Beckham was competent to transact the business ?
“Answer. In my judgment, he was not.
*407 “Question. State whether or not the transactions of the clay hacl excited and wearied him bodily and mentally, and what was his condition when he finally agreed to sign the contract ?
“Answer. He was so wearied out that he seemed to be indifferent, and said ‘let it go’; and was at the time incompetent to transact the business.
“ Question. How did lie look upon the Yankee army, and liow did the prospect of their coming affect him?
“Answer. He looked on the coming with perfect horror and dread.
“Question. State whether J. M. Botts showed a desire to purchase the land, and all he said about the treatment Beckham might receive if he held on to the land ?
“ Answer. He said if the Yankees came, there toas no telling what they would take, and hold the country, and would treat him (Beckham) and all of us as secessionists, and made the impression we might hace nothing ice could cull our own. That was the kind of argument he used to persuade him to sell his land.
“ Question. State whether Boss seemed anxious to make the sale, and what he said to you in regard to it ?
“Answer. He was very anxious to make the sale; said, if he made it, he would make a damned lig fee; if he did not, he would lose it; said Beckham had treated him very badly about it. This was during the day before the contract was signed.”
John G. Beckham says: “I was present. I think it (the sale) was mainly brought about through the influence of Col. Boss. * * * Mr. Boss wrote several contracts, I think, for my father to sign; some very noisy discussion took place between my father and Col. Boss in regard to the contracting; my father I don’t think seemed to know what to do; high words *408 occurred, between Mr. Ross and my father, and a good deal of feeling was shown, Mr. Ross being anxious that he should make the sale.”
Thomas S. Alcocke does not recollect that any proposition, as to buying and selling, was made in his presence by either Botts or Beckham. lie left in the evening before the contract was signed, and was not prepared for the information received the next day, that the sale had been concluded.
Ross states it as his impression that the contract was. signed in the forenoon of the day it bears date. Kennedy and John G-. Beckham state that it was signed after dark.
While the evidence proves that Beckham -was laboring under great excitement during the negotiation, and tends to show that he drank more or less ardent spirits, yet there is no proof whatever that he was induced to drink by Botts, Ross, or any other person.
After the contract was signed, John G. Beckham says his father retired to his 'room in a highly nervous and excitable state of mind, was very restless and kept his lamp burning all night, as well as he could remember. He always slept in the room with him.
The next day, says Thomas S. Alcocke, he wras very much excited, and spent a good deal of his time in walking up and down the porch. lie had several conversations with him, but does not remember the particulars. On the following day (Monday) there was an appraisement of furniture, which Botts was to take at valuation. After the appraisers had valued a lot of crockery at $625 or $650, a low price as they thought, and after Botts had declined to take it, Alcocke and Flint, the latter being one of the appraisers, told Beckham they -would take the lot at that price, and not to sell it for less. The next morning, when Alcocke returned to Auburn, he ascertained that Beckham had sold the whole lot to *409 Botts, including some few other articles, for $800. This conduct seemed to strike even Boss as strange. He also ascertained that in his absence Botts had bought from Beckham some hogs which had been reserved under the contract, but had not paid for them. Alcocke, without consulting Botts, took possession of the hogs and had them slaughtered at once for Beckham’s use.
Whatever remedy at law the purchasers of Auburn and those claiming under them may have, a court of equity, under the principles governing its jurisdiction, can never aid them, as it seems to me, to carry into execution a contract of the nature and magnitude of the contract of the 29th of ^November, 1862, made with a man in Beckham’s condition, mental and physical, and procured and executed under the circumstances proved in this case.
If full credit is given to Kennedy’s testimony, the contract was procured by pressure and undue influence exerted upon a mind shown by other testimony as well as his to be too much enfeebled by disease to resist the improper appliances brought to bear upon it. If his testimony be altogether discarded, there is enough in the circumstances established by the testimony of Boss, a witness examined by the appellants, and others, to make the case oí too doubtful a character to justify the active assistance of a court of equity to give the relief sought. Under the circumstances the burden was upon the complainants to make out a clear case for the exercise of an extraordinary jurisdiction. They have fallen very far short of the requirements of the rule in such cases.
It was argued with great earnestness by the counsel for the appellants that the circumstances detailed by Boss show an active, enquiring and discriminating mind in Beckham. It does not so strike me. I rather think they tend to show a mind weak and vacillating, and *410 evince a want of fixedness of purpose and an unwillingness to adopt a proposition of sale that had been made for him, and was persistently and unduly pressed upon him, and that the final consent attributed to him was a constrained consent, and not that “ full, entire and intelligent consent ” which a court of equity requires to be shown in every contract before it will lend its aid to enforce it. Mr. Botts was present, and saw, heal’d and knew all that passed, and actively participated in the negotiations. When Beckham first claimed that half the wheat should he reserved, Ross consented, agreeing to abate his commissions to that extent. When Mr. Beckham next claimed to reserve the corn, Boss says that “Mr. Botts yielded in that claim, and also in the claim to reserve some few other things.”
' When objection after objection was made by Beckham, and one was no sooner removed than another was made, it must have been obvious to Mr. Botts that Mr. Beck-ham was unwilling to enter into the contract, and that the objections made were rather pretexts, to avoid a sale. Mr. Botts should then have declined to proceed further in the matter. Instead of that, w’hen, in the language of his answer, “this disagreement (between Boss and Beck-ham) was approximating warmth,” he said to Beckham, “Well, Mr. Beckham, don’t let us have any misunderstanding or chaffering about it; make your own proposition to me in writing, and I will at once accept or reject it.” The proposition, Mr. Botts says, was then written by Boss as dictated by Beckham, and was “at once accepted in writing,” as found in the record. Instead of suggesting and inciting this proposition, and then accepting it, after what had passed between the parties, as detailed by Boss, Mr. Botts should have declined all further negotiation.
If the whole amount of the purchas-emoney had been paid by Botts at the date of the contract, instead of the *411 part which was paid, and no deed having been made, a bill had been filed for the title, I should have, been of opinion, for the reasons already stated, that the bill be dismissed and the parties left to their legal remedies, unless it were shown that the contract had been rendered enforceable by subsequent ratification or acquiescence equivalent to ratification. "When the complainants (appellants here) undertake to show that the payment of the $55,000 on the 10th day of December, 1862 (when, in the language of the decree of this court, James A. Beckham “was utterly incapable, mentally and physically,.of executing a deed, or of entering into or consummating any important contract”), was subsequently confirmed by him, the act of confirmation, to entitle them to specific performance, must extend to the contract—in other words, the subsequent recognition of the payment can only be relied on as evidence of the ratification of the contract, and to be effectual it must possess all the legal requisites of such an act.
The law on this subject is well stated in a recent English treatise of merit:
In order that an act may have any effect or validity as a confirmation, it must clearly appear that the party confirming was fully apprised of his right to impeach the transaction, and acted freely, deliberately and advisedly, with the intention of confirming a transaction which he knew, or might or ought, with reasonable or proper diligence, to have known to be impeachable. If his right to impeach the transaction be concealed from him, or a full disclosure be not made to him of every circumstance which it is material for him to know, or if the act takes place under pressure or constraint, or by the exercise of undue influence, or under the delusive opinion that the original transaction is binding on him, or if it be merely a continuation of the original transaction, a confirmation *412 operates as nothing. Kerr on Fraud and Mistake (Am. ed.) 296.
The same learned author, speaking of acquiescence, says, to fix acquiescence upon a party, it must unequivocally appear that he knew or had notice of the fact upon which the alleged acquiescence is founded, and to which it refers. Acquiesence imparts and is founded on knowledge. A recognition resulting from ignorance of material facts goes for hoiking. The question as to acquiescence cannot arise unless the party against whom it is set up was aware of his rights. A man cannot be said to acquiesce in what he does not know, nor can he be bound by acquiescence unless he is fully apprised as to his rights and all the material facts and circumstances of the case. Nor, indeed, is a recognition of avail which assumes the validity of .a transaction, if the question as to its validity does not appear to have come before ■ the parties. # * * The-proof of knowledge lies on the party who alleges acquiescence, and sets it up as a defence. • If the transaction has taken place under pressure or under the exercise of undue influence, it must clearly and unequivocally appear that the party against whom acquiescence is alleged was sui juris, and was released from the influence or the pressure under which he stood at the time of the transaction, and acted freely and advisedly in abstaining from impeaching it. Acquiescence goes for nothing so long as a man continues in the same situation in which he was at the date of the transaction. Idem, p. 300.
After Mr. Beckham had been removed from Auburn to Culpeper Courthouse, (a few days after his last attack of paralysis, in December, 1862,) he continued to reside thei’e until about the middle of the year 1867. He was then removed to Alexandria, where he died in the summer of 1868. If he was ever in a condition to ratify any previous transaction connected with the sale of his pro *413 perty, or the payment of the purchase-money, or did at any41me or in any way so ratify it, it will not be denied that it was incumbent on the appellants to show it, and, under the authorities, to show it clearly, before any claim could be based upon it.
There is as much conflict in the evidence touching Beckham’s mental condition after his last attack of paralysis as before. Notwithstanding his utter physical prostration, many intelligent witnesses express the opinion that he possessed mind sufficient to transact business. Some of them say that he seemed to take an interest in the events of the war, recognized old friends, made enquiries after the families of those who came to see him, and manifested an interest in occurrences of the day. But the decided weight of the evidence is that he was almost totally demented. Six physicians testify to his imbecility, none to his capacity.
Dr. Harris, speaking of him in 1864, says he was then “ a melancholy and perfect wreck of both body and mind, the result of cerebral apoplexy, now in both hemispheres of the brain, causing paralysis of both sides.”
Dr. Dixie describes him in 1868 as “ physically very feeble, and his mental condition was such as lawyers term dementia. By reason of partial general paralysis,' the brain was unable to perform its functions, the body its motions, the limbs failed to obey his remnant of will, his tongue to articulate distinctly, and his face was drawn.”
Dr. Thompson saw him on several occasons from 1863 to 1865, and describes him as “ almost perfectly helpless. * * * Mentally he was a perfect imbecile. He was totally unfit to transact business of any kind, being helpless, and, in fact, idiotic^
John G. Beckham, who, with filial duty, attended him as a nurse, thus describes his condition in the years 1863, 1864, 1865 and 1866: “He was as helpless as an infant, *414 and had to be treated as such, lie had to be taken out of the bed in the morning, and washed and dressed and i'ed by the assistance of myself and a servant. * * * His spirits were generally very low. He became very weak and childish, shed tears upon the most trivial occasions, sat frequently without attempting to converse with any one for hours at a time; and towards the close of his life seemed to lose his spirits, and was hard to move-seemed to take no interest in anything.”
An intelligent lady, Mrs. -Eliza Thompson, gives this graphic account of him in 1865 : “He was a paralytic, perfectly useless, completely helpless in the hands of the servants, who carried him about the house. When he was on the bed he could not raise up without assistance, and when seated in a chair he could not rise without the help of his attendants. His condition was dreadful and distressing to behold, and sometimes when he was moved he would scream and make a noise more like some wild beast than a man, and on some of these occasions I would go over to see what was the matter. * * * Judging from his conversation, he had no intelligence. In his conversation he never alluded to the past, though he had known me from a child. I looked’ upon him as a perfect imbecile. Sis countenance indicated absence of all intelligence, and he reminded me more of an animal strapped up-than a human being, I went to see him out of pure sympathy.”
It would seem absurd to attribute to a man in Mr. Beckham’s condition the deliberate and intelligent ratification of a transaction of such magnitude as the sale of his fine estate for $100,000 in Confederate money under the circumstances proved in this case, the collection of the proceeds in checks, the negotiation of the checks, and the investments - made. To enable him to make such ratification valid and binding he must have had the mind to recall these tranc *415 actions as they occurred, to comprehend them clearly and fully in all their details, to know and understand his rights in regard to them, and to- deliberate and determine upon his course of action; and, with this capacity, he must have acted with the view to ratification. I care not to comment, at length and in detail, on the testimony of Thomas S. Alcocke. I believe he intended to do what he thought was right and best under the circumstances. Mr. Beckham’s sons, except the youngest, a boy of fifteen years, were all in the army. His near relatives and' friends had left the county. Alcocke had transacted business for him, especially attending to his money matters, for years. He knew he had the confidence of Mr. Beck-ham and his family. He therefore took charge of his business as if he had been his committee. He received the checks, had them endorsed by Beckham’s daughter, negotiated them, collected the money on them, paid (as he says) part to Mrs. Boss as her marriage portion, invested the residue in Confederate securities, collected the interest as it matured, and applied it, together with other moneys in his hands, to the support and maintenance of Mr. Beckham and his children. In all this he claims that he had the approbation of Mr. Beckham, and speaks of his orders and directions. But the authority under which he assumed to act seems to be based on presumptions, inferences, and deductions. From his deposition I take the following questions and answers as indicating the kind of sanction under which he acted:
“ Question. Bid Mr. Beckham ever know that you had collected all the purchase-money for the Auburn estate upon the checks given by Stearns ?
“Answer. I presume so.
“ Question. Bid he ever know how you had invested the same ?
*416 “Answer. I should think he did, as he knew his income came from this investment, and of this he spoke frequently.
“ Question. Did he ever complain or approve of-the mode in which you had invested this money ?
“Answer. I never heard him, as well as I recollect, either complain or approve.”
It most concerned the appellants to establish, if they could, the recognition and sanction.of the payment of the |55,000. The necessity of doing so was most obvious, for on the day the check for that sum was passed by- Botts, Beckham was wholly incompetent to “ consummate any important contract ” or transact any important business. It does not appear that the transactions of that day were ever brought before the mind of Beckham by Alcocke or any other person, or that he ever afterwards made the slightest allusion to them. If he ever undertook any business transaction after this last attack of paralysis, which occurred on the 3d day of December, 1862, it has not been proved. The acts attributed to him on that day were not his; they were the acts of others, but they were scarcely less his than the endorsements made for him on the checks a very short time afterwards. So of the advancement made to Boss and wife; an act equivocal at most, as an act of ratification, even if Beckham had been competent to direct it, for at the time it was made it would seem that Alcocke had in his hands money belonging to Beckham, other than the proceeds arising from the sale of Auburn, sufficient to pay it.
The question as to the liability of Boss and wif» and the other heirs of Beckham for any money they may have received from Alcocke arising from the sale, if they received any such, is not made by the pleadings in this cause, and cannot affect the determination *417 of the only matter which the court is required to decide, to-wit: whether or not the appellants are entitled to a specific performance of the contract of the 29th November, 1862.
It is unnecessary to discuss or pass upon the question of estoppel, raised by the appellees in their answer to the bill of the appellants, as the case is disposed of on other grounds, and this opinion has already been extended further than I could have wished, in a discussion, deemed proper and necessary, of other important questions involved in the decision of the case.
"When I first read the record, I rather inclined to the opinion that the contract which is the subject of the suit' should be rescinded upon equitable terms, but on further examination and mature reflection, I have come to the conclusion that, rescission cannot properly be ordered.
A party seeking as plaintiff to rescind a contract is required to make out a stronger case for the relief sought than he would be required to make if as defendant he were resisting specific performance of the same contract. Upon the same facts proved he might succeed as defendant in the latter case when he would fail as defendant in the former. A court of equity is always reluctant to rescind, unless parties can be put back in statu, quo. If this cannot be done, it will give relief only where the clearest and strongest equity imperatively demands it. 1 Story’s Eq. Jur. § 769; Grimes v. Sanders & others, 93 U. S. R. (3 Otto), 55; Graham v. Pancoast, 30 Penn. Rep. (6 Casey) 89.
After the great lapse of time and the changes which have taken place since the date of the contract in this case, it would be very difficult, if not impossible, to put the parties in statu quo; but, in addition, the decree of this court made in the case of Beckham *418 & others v. Botts & others would seem to be an insuperable barrier to any decree for rescission in this case. The object of that suit was not only to cancel the deed of the 10th of December, 1862, but also to rescind the contract of the 29th of ¡November. The circuit court refused to do either. On appeal, this court reversed the decree of the circuit court, and entering such decree as the circuit court should have rendered, set aside and overruled the deed, but did not rescind the contract. On the contrary, liberty was granted the then appellees (who are the appellants here now) to file a bill for specific performance. This was substantially an adjudication, that although it was a case in which the purchasers of the property might perhaps show themselves entitled to performance, it was not a ease in which the vendors were entitled to rescission. The adjudication of the question of rescission in that case is conclusive of the same question in this case between the same parties.
Upon the whole matter I am of opinion that there is no error in the decree appealed from, and that it should be affirmed.
Anderson, J., concurred in the opinion of Burks, J.
Staples, J., concurred in the opinion as to the refusal of the specific performance of the contract.
Moncure, P., and Christian, J., dissented. They thought the specific execution of the_ contract should be enforced.
Upon the rehearing:
Staples, J.
A decree was entered at the March term of this court affirming the decree of the circuit court of *419 Culpeper. The effect of that decision was to place the appellees, the heirs of Mr. Beckham, in possession of the “Auburn estate,” and to leave the appellants, and the heirs of Mr. Botts, to their action at law to recover damages for a breach of contract. A petition has been since filed for a rehearing of so much of the decree as dismisses the appellants’ bill without decreeing a return of the purchase-money.
The sole question we now are to consider is whether the decree shall be corrected in that particular. I do not propose even to attempt to notice all the points made by counsel, or all the authorities cited. My effort will be in as brief a way as possible to give my own views of the law governing the case, and of the facts as shown by the record. In the first place, I think there is a w-ide distinction between an application to a court of equity to assess damages arising from a failure to convey, and an application for the repayment of the purchase-money, when the vendor is unable or unwilling to convey. In the first case, as is universally conceded, a court of lawr is generally the more appropriate tribunal, where the jury, being confronted with witnesses, may aw’ard the purchaser such damages as he may have sustained by the breach of the contract. The second case relates to matters of accounts, questions of rents and profits, improvements made, and payments of the purchase-money, which can be most satisfactorily settled by a commissioner under the supervision of a chancellor than any jury that can be impanelled. This distinction was recognized by Lord Eldon in Todd v. Gee, 17 Ves. R. 273, 277. He there said he should be inclined to support the wdiole force of previous authority against Denton and Stuart, not being aware that this court would give relief in the shape of damages, which is very different from giving compensation out of the purchase-money. Ilis opinion was that a court of equity ought not, except under very peculiar *420 circumstances, as there may be upon a bill for specific performance, to direct an issue or reference to the master to ascertain damages—that is, purely at law. It has no resemblance to compensation. And in Anthony v. Leftwitch, 3 Rand. 238, 265, Judge Green took the same view. He said, as to the measure of compensation, it ought to be precisely what Anthony, the purchaser, was out of pocket in consequence of the acts done by him upon the contract. Ho allowance can be made to him for any disappointment in the non-execution of the agreement. That would be to decree damages, and no damages can be decreed in equity.
A failure to advert to this distinction has given rise to much of the confusion and difficulty in the various cases on this subject. .Because the equity courts have, as a general rule, refused to entertain bills for damages, it is taken for granted they will equally refuse application for compensation, except specially as incidental to some other relief. But whatever may have been the rule heretofore, there is no doubt that a court of equity, even where specific performance is refused, will now decree compensation to the purchaser in many cases. • It will do so where there is no adequate remedy at law, where some peculiar equity intervenes; it will do so to prevent multiplicity of suits, and where it has obtained jurisdiction of the case on other grounds. Where the bill is framed with a double aspect and contains a prayer for alternative relief, if the court is unable to execute the contract, it will go on to decree the repayment of the purGhase-money. I do not mean to affirm it will do so in every instance. There may be cases in which the conduct of the purchaser is such as to preclude him from all relief in the equity forum. What I mean to say is that upon a bill properly framed the court, as a general rule, will decree the purchaser his purchase-money instead of turning him around to an action at law to recover it. In *421 Virginia this doctrine may be regarded as now firmly settled. I shall content myself with a simple reference to the decisions on the subject without attempting to discuss or comment upon them. Anthony v. Leftwich, 3 Rand. 238; Payne v. Graves, 5 Leigh, 561, and the authorities there cited; Bowles v. Woodson, 6 Gratt. 78; McComas v. Easley, 21 Gratt. 23-31; Nagle v. Newton, 22 Gratt. 814.
The same view is taken by the supreme court of the United States in Watts v. Waddle, 6 Peters R. 389; Holt and wife v. Rogers, 8 Peters R. 420-434; King's heirs v. Thompson and wife, 9 Peters R. 204; and by Chancellor Kent in the several cases referred to in the Virginia decisions.
There are numerous other American authorities to the same effect. Aday v. Echols, 18 Alab. R. 357; Payne v. Atterbury, Harrington Eq. R. 414; Shirley v. Shirley, 7 Black. R. 452; 2 Chy. R. 196; 5 Jones N. C. Eq. 155; and other decisions in vol. 2, part 2, 1153, Leading Cases in Equity.
In some of these cases it is held that the court will go on to decree compensation under the prayer for general relief; and if this cannot be done consistently with the case made in the bill, leave will sometimes be given to amend the pleadings in order that the plaintiff may properly present his case. In Parkhurst v. Van Cortlandt, 1 John. Ch. R. 273, Chancellor Kent refused to execute the contract, and although the plaintiff did not in his bill ask any relief on account of improvements, not looking to the alternative of losing it, yet the chancellor directed an account to be taken between the parties, crediting the purchaser with a reasonable compensation, and charging him with a reasonable rent.
There is another class of cases in which a court of equity will decree compensation although specific performance cannot be enforced. 'Whenever the court *422 •obtains rightful jurisdiction of the parties and the' subject matter for one purpose, it will make its jurisdiction effectual for all purposes. This principle is adverted to by Mr. Justice Nelson in Tayloe v. Merchants Fire Ins. Co., 9 How. U. S. R. 390, 405. In that case he said “it would be an idle technicality for a court of equity to turn the party over to his remedy at law.” And no doubt it was a strong sense of this injustice that led the court at an early day to establish the rule, that having properly acquired jurisdiction over the. subject for a necessary purpose, it was the duty of the court to proceed and do final and complete justice between the parties when it could be done as well in that court as in proceedings at law.
This rule has been recognized and enforced in numerous cases in Virginia. Among them are Hoover v. Calhoun, 16 Gratt. 109; McComas v. Easley, 21 Gratt. 23; Hendricks v. Gillispie, 25 Gratt. 181; in each of which the court, having refused specific execution, decreed compensation to the proper parties, upon the ground that the court being in possession of the ease it would put an end to the controversy by giving complete relief.
Let us now enquire whether this court; consistently with these principles, is authorized to decree in favor of the appellants the value of the purchase-money if upon equitable grounds they are entitled to it. The case has been argued throughout by the counsel for the appellees as if it rested exclusively upon the bill for a specific performance filed by the appellants under the direction of this court. It seems to be forgotten that the ease was first brought into court upon the bill to rescind the contract and to have the land restored, filed by Mr. Beckham’s committee, and afterwards revived in the name of his heirs. It was at the in *423 stance and for tlie benefit of the vendor a court of equity first obtained tlie jurisdiction of tlie cause.
Upon that bill a decree was rendered vacating the deed and directing the purchaser to surrender the land unless they should file their bill for a specific performance within a certain time prescribed by the court. If the parties had not been required to file a bill for specific performance, and the cause had proceeded to a final decree upon the original bill, is it to be believed that this court would have annulled the deed and ordered a return of the land without at the same time directing all proper accounts to be taken, so as to make an end of the whole cause? "Would it have required the vendees to surrender the land and then turn them over to another forum to litigate their claim to the purchase-money ? Such a course would have been utterly inconsistent with the maxim “ that as the vendors wished equity, they must do equity.” It would have violated the principle that the court, having righfully obtained jurisdiction of the cause, would go on to settle the rights of the parties, do complete justice between them, and close the controversy forever.
I beg to ask how it is .the filing of the bill for specific performance has so completely changed the entire aspect of the case and the rights of the parties ? That bill was a mere continuation of the original suit; it was part and parcel of it. It was filed for a particular pui’pose, and that was to bring before the court the question of the appellants’ right to a specific performance, and to place them in the position of invoking the extraordinary powers of the court in their behalf, and as to that question, and that question only, giving to the appellees all the advantages of a defensive position. That bill subserved all the purposes for which it was designed. It had its day in court, and *424 was dismissed. The decision settled that the appel^■an'ts were not entitled to a specific performance, hut settled nothing else. The dismissal of the bill left the parties precisely where they were before it was £ie¿p pk ieffc the original bill and all the proceedings herein f01’ce- That bill is still pending, and has never to this day been disposed of. If this be not so, by what authority was it that the judge of the circuit court, after dismissing the bill for a specific performance, undertook to decree the return of the land to the appellees ? The decree of this court first pronounced did not require an unconditional surrender of the land; it merely declared that the appellants should do so in less than ninety days, unless they filed their bill for specific performance. So soon, therefore, as the bill was filed, the duty of the appellants to surrender the land ceased, and they will not thereafter be turned out of possession except by action of law or by a further decree of the court.
When the bill for specific performance was dismissed, two courses were left open, either of which might be pursued. One was, to leave the vendors to their action of ejectment for the recovery of the land, and the purchasers to their proper action for the recovery of their purchase-money. The other ivas, to go on under the original bill, settle all the matters in controversy and end the litigation between the parties. If the court had properly obtained jurisdiction of the case, this latter course was most just and reasonable, and most consonant with the rules and practice in Virginia. One of the counsel for the appellees tells us his clients are defendants; they ask nothing, and cannot be put upon terms; their day of seeking is ended. This is an entire mistake ; they asked that a deed of conveyance, executed by their ancestor, should be annulled and put out of the way, and they *425 further asked that the subject of controversy should be taken from their adversaries and turned over to them. If the day of seeking is ended, it is only because all their demands have been granted. Surely if it was competent for the court, upon dismissing the bill for a specific performance, to decree the appellees the possession of the land, it was competent to decree the appellants their purchase-money.
It is said, however, that the appellants’ bill contains no alternative prayer for the return of the purchase-money; no issue has been made upon that question, and the appellees will be taken by surprise. Whose fault is it that there is no such prayer and issue ? Not the appellants, certainly ; they were required by this court to file just such a bill as was filed. A prayer for alternative relief would have been irrelevant and^foreign to the main purpose of that bill, which was to present a single issue touching the execution of the contract. Nor was it necessary, because the appellees had by their original bill placed the whole matter of controversy under the control of the court, and might justly be required to submit to equitable terms as a condition of relief.
But this is not all. Any one looking through the two voluminous records in this case will see that every fact connected with repayment of the purchase-money, every circumstance bearing upon it,hasbeen as fully investigated as if a direct issue had been presented by the pleadings. And now, after a controversy so long continued, it is altogether impossible that any new fact can be established, or new witness found, upon any point arising in the case.
These considerations satisfy me that there is nothing in the pleadings or in the present condition of the case to preclude the court from ordering all proper accounts to be taken, and administering complete and final relief. On the other hand there are various reasons sufficient to *426 show that this relief ought now to be afforded without turning the parties over to a court of law for redress.
In the first place, if the appellants are compelled to bring a new suit for the recovery of the purchase-money, they are liable to be defeated by the statute of limitations.
As more than five years have elapsed, and as the action must be assumpsit, I cannot see what there is to prevent the operation of the statute. I admit that if a party improperly resorts to a court of equity and is there defeated, he cannot be heard to say that the court ought to retain the case merely because he may be met in a court of law by a plea of the statute of limitations. But that is not this case. Here the appellants were first brought into chancery by the appellees, and they have been kept in that court by the action of their adversaries and the decree of this court until their remedy at law, if not entirely lost, is certainly inadequate. In the next place, the death of Mr. Beckham has changed the entire aspect of the case.
An action at law must, of course, be against his personal representative only. Inasmuch as there are no assets, such an action will, of course, be unproductive. A judgment against a personal representative would not be binding upon the heirs; and if evidence at all, certainly not conclusive against the latter in a proceeding to subject the land. So, after years of fruitless and unnecessary litigation with Mr. Beckham’s administrator, the appellants must, at last, return to a court of equity, and in that forum renew the controversy.
But in the mean time, while the appellants are litigating with the personal representative, the land may be aliened by the heirs, or encumbered, or so deteriorated in value as to afford no adequate indemnity or security to the appellants. I lay it down as indisputable that if the appellants are entitled in equity and good conscience *427 to recover the purchase-money paid, or its value, they are entitled certainly against the heirs of Mr. Beckham to a lien on the land as a security for its repayment Whatever doubts there may have been on this subject, it is now clearly settled that such a lien does exist in favor of the purchaser, and will be upheld by a court of equity. The authorities sustaining it are almost innumerable, as may be seen by reference to 1 Leading Cases in Equity, part 1, page 474; 3 Parson’s on Contracts, 278; Adams’ Equity, 284; 2 Nash on Real Estate; 1 Jones on Mortgages, § 223; and many other authorities not necessary to mention. Two cases may be especially noticed; one of them is Wythes v. Lee, 3 Drew R. 396, 25 Law Journal, 177. There the estate was sold by a niortagee for 380,000 pounds, of which thirty-eight thousand pounds, part of the purchase-money, was paid by way of deposit. A bill having been filed by the purchaser claiming a lien on the estate for his deposit, a demurrer to the bill was overruled. The Vice-Chancellor, S. II. Eendersly, said: “ Suppose a person, absolute beneficial owner in fee of an estate, contracts to sell it, and the purchaser pays a deposit in part payment of the purchase money, and by reason of the veudor being unable to make a title, or from any other reason, not being misconduct on either side, the contract goes off and cannot be completed, has the purchaser a lien on the estate for the deposit ? That is the most important question. As there is a right of lien, as that is a right in equity, it follows that it must be capable of being enforced by bill. Now, that question I have looked at from three different points of view. Eirst, in reference to natural justice, irrespective of any specific rule of law, and it does appear to me that it is consistent with natural justice that if a purchaser, on the faith of the contract being accepted and the estate becoming his, has advanced money in payment or part payment for the purchase, he has advanced it under circumstances which *428 entitle him to say: ‘If you cannot complete, not only are you bound to give me back my money, hut I have a . right to a lien on the estate.’ ”
The learned judge then proceeds to discuss the difference between this lien of the purchaser and the implied lien of the vendor for the unpaid purchase-money. He admits that in their origin they are not the samel “ But when a contract is made, and then goes off', in principle and in justice the equity of the purchaser to a lien on the estate ought to stand on as good a footing as the lien of a vendor after conveyance.”
The other case is that of Rose v. Watson, decided by the House of Lords, reported in 10 House Lords Cases, 672. There Lord Oranioorth said that when the purchaser has paid the whoíe or part of the purchase-money, and gets no conveyance, he thereby acquires a lien exactly in the same way as if the vendor had executed a mortgage to him of the estate to that extent. “ It seems to me” (lie said) “that that is founded upon such solid and substantial justice, that if it is true there is no decision affirming that principle, I rejoice that now, in your lordship’s house, we are able to lay down a rule that may conclusively guide such questions for the future. I think, however, there are some authorities which have been pointed out which have established that rule, in principle if not in terms. But I think it is unimportant to go into that, because it is now established, and will from henceforth be established, as a very sound principle founded on solid justice.”
•Whether, as intimated in a number of cases, an independent bill may be filed to enforce the purchaser’s lien, where specific performance is impracticable, it is not ma-' terial now to enquire. Nothing can be clearer than when the vendor resorts to a court of equity for relief, the.court cannot decree him the land without, at the *429 same time, giving to the purchaser the benefit of bis lien for the purchase-money.
My opinion, therefore, is that the appellants are entitled to an account if they desire it.
I never had any difficulty with respect to the $45,000 paid to Mr. Beckham on the 25th November, 1862, when the contract was made, and so expressed myself when the case was last-decided.
I had, however, great difficulties with regard to the $55,000 paid on the 10th December following, when, as this court held, Mr. Beckham was physically and mentally incapacitated to enter into an important contract.
Subsequent reflection has, however, satisfied me that the two payments stand substantially on the same ground. At least there is no such difference between them as will justify the court in sustaining the one and wholly rejecting the other. It is important to bear in mind that neither in the opinion of the circuit judge, nor of any judge of this court, has it been held that Messrs. Botts and Stearns were guilty of fraud in procuring the contract of the 29th November, 1862. Nor has it been held that Mr. Beckham was legally incompetent to make that contract. Nor did this court, or the other court, refuse to decree the specific perfoi’mance because the $55,000 was paid when Mr. Beckham was incapacitated to make an agreement for the sale of his land. If that payment had been made on the 29th of November, the result would have been precisely the same.
The ground upon which the decision was based, was that in any case specific performance is a matter of sound discretion. The court will not exercise this extraordinary jurisdiction unless the agreement is just and fair in all its parts, and entered into with the free and intelligent consent of all the parties. And in the present case it was manifest that Mr. Beckham’s mind had become greatly impaired by disease; that while no undue influence may have been *430 exerted by Mr. Botts, it had been exerted by others in his presence; that Mr. Beckham had at no time given his full and intelligent consent to the sale of his land; and that these facts and others, coupled with the great inadequacy of compensation, renders it a case peculiarly, improper for specific execution. In that view I fully concurred, and I have never had any reason to doubt the justice and soundness of the decision. But' it does not follow that because the purchaser is denied specific execution, he must also be denied return of his purchase-money. So far from it, the very fact that he is refused a conveyance of the land is a conclusive reason for the repayment of the consideration.
And it is worthy of note that while Judge Wingfield and the majority of this court refused, under the circumstances, to execute the contract, they also declined to set it aside, leaving the appellants to their .remedy at law for compensation and damages; which w7as quite a vain thing if Mr. Beckham w7as incompetent on the 29th of November, 1862, even to make an agreement to receive the purchase-money. .1 have already said the two payments must stand substantially on the samq ground.
When, on the 10th of December, Mr. Botts paid the $55,000, he paid what he had stipulated to pay, and on the identical evening ■ Mr. Beckham had agreed to receive it at the time of the entering into the contract. The payment was made in checks, receivable by the brother-in-law of Mr. Beckham, his friend and agent, and endorsed by his daughter. The greater portion of that money was invested along with the $45,000—about $85,000 in all—in North Carolina bonds and Confederate registered and coupon bonds—the very securities Mr. Beckham had, several months previous, indicated in .the event he made sale of his land. Such an investment was deemed as safe, at the time, as any that could be made; and if the fund has been lost, it w7as not due *431 to the fact of Mr. Beckham’s incompetency when the payment was made, but the disastrous failure of the 'Confederacy. The money thus invested yielded a very large interest, which was regularly drawn throughout the war and applied to the support of Mr. Beckham and his family, and, as the evidence shows, constituted their only means of subsistence. There is not a shadow of doubt that if Mr. Beckham had been in the same condition on the 10th of December as he was on the 29th of November he would have received the money and invested it in the way it was invested.
It is proper, also, to mention that about §15,000 of the money paid by Mr. Botts was received by a daughter of Mr. Beckham as her marriage portion, and with his knowledge and consent.
I have no doubt that both payments were made by [Messrs. Botts and Stearns in good faith, and in the execution of what they believed to be a valid contract, and which was so treated by all the parties at the time.
The appellees received the benefit of it, to a large extent, and they ought not to escape a just accountability because the investment has turned out to bo unfortunate.
tTpon the whole case my opinion is that the appellees ought to be charged with the value of the payments made on the 29tli day of November, 18G2, and the 10th day of December, 1862, and interest thereon. The amount paid on the 10th of December has been treated as if it were §55,000. It appears, however, that a part of it was for the purchase of personal property. There can be no difficulty in ascertaining how much of it vms in payment of the land. On the other hand, the appellants are to be charged with the sum of §16,000, or whatever may have been received from the Federal government, or from any other source, on *432 account of the property, and with interest thereon. They are also to be charged with a fair annual value of the land in the form of rent, tó be estimated according to the condition of the property at the time possession was taken by Messrs. Botts and Stearns; and they are to be charged with interest upon such rent according to the principles settled by this court in Bolling v. Lersner, 26 Gratt. 36. They are further to be charged with any loss or damage arising from the destruction of the property occasioned by their neglect or mismanagement .during the time they or those under whom they claim have had the property. They are, however, to be credited with taxes paid, and with the value of any lasting and beneficial improvements made by them on the property during the time of such possession. These matters must be referred to a commissioner, with directions to take an account between the parties, on the principles here announced. If on the return of the report it shall appear that a balance is due the appellants, the same is to be treated as constituting a lien on the land in controversy, to be enforced, if necessary, by a sale of the premises. On the other hand, if the balance shall be in favor of the appellees, a decree is to be rendered in their favor against the parties properly chargeable with the same. And with a view to a final adjudication of all matters in controversy, the personal representatives of John Minor Botts and James A. Beckham must be made parties to the suit before the said account is taken. I am well aware that this decision but tends still further to protract this unfortunate controversy, now already too long continued, but surely it is preferable to the trouble and expense of a trial by jury, with all chances of writs of error and appeals to this court. Whatever may be the rights of the parties, it is better they should be now anticipated and finally adjudi *433 eated in this court, than that they should be turned over to a costly and troublesome litigation in another form. The appellants in asking this decree must of course be held to release all their rights under the contract, and to surrender every claim for damages both in equity and at law.
Moncure, P., and Christian, J., were still of opinion that the contract should be enforced, but they concurred in the opinion of Staples, J., as coming nearer to what should be done than the original decree.
Anderson and Burks, J’s, adhered to their opinion.
The decree was as follows:
This day came again the parties by their counsel, and the court having maturely considered the transcript of the record of the decree aforesaid, and the arguments of counsel, is of opinion, for reasons stated in writing and filed with the record, that the appoB lants are entitled to recover the value of the Oonfedea rate treasury notes paid by Botts and Stearns to James A. Beckham on the 29th November, 1862, and the 10th December, 1862, upon the purchase of the Auburn farm, with interest thereon from, the date of such payments respectively; said value to be estimated in gold as of the time of said payments.
The court is further of opinion, that the appellants are to be charged with the fair annual value of the said Auburn estate, in the form of a rent, with interest thereon from the end of each year, during the time they or the said Botts have had possession of the property; the said rent to be estimated according to the condition of the property at the time possession *434 was taken; they are further to be charged with the sixteen thousand dollars, or whatever has been received by them,-or by Botts and Stearns, or either of them, from the Federal government, or from any other source, on account of said property, with interest thereon from the time the same was so received; they are also to be charged with any loss or damage resulting from the deterioration of the property occasioned by the waste, mismanagement or neglect of the appellants or those under whom they claim. On the other hand, the said appellants are to be credited with all taxes paid and all other sums which would have constituted a proper and legal charge upon the property in the hands of James A. Beckham or his representatives, with interest thereon, and with all necessary expenses actually incurred in recovering the money aforesaid from the Federal government.
These matters must be referred to a commissioner with instructions to state an account between the parties on the principles herein indicated; the costs of taking said accounts to be equally divided between the parties. If, on the return of the report, it shall appear that a balance is due the appellants, said balance is to be treated as constituting a lien on the property, to be enforced, if necessary, by a sale of the premises upon the terms prescribed by the third section, chapter 174, Code of 1873, page 1123; but the appellees are not to be held liable personally for such balance, or any part thereof. On the other hand, if, upon the return of said report, it shall appear that a balance is due the appellees, a decree is to be rendered in their favor for the same against such party or parties as may be chargeable therewith.
But before said account is taken the appellants are required to amend the original bill filed by them, and to make the personal representatives of John Minor *435 Botts and James A. Beckham, respectively, parties to the same.
It is therefore ordered and decreed, that the contract of the 29th March, 1862, between James A. Beckham and Botts and Stearns he set aside and annulled; and that so much of the decree of the circuit court, and also of the decree of this court, of the 14th March, 1878, as is in conflict with this decree he reversed and annulled, and in all other respects affirmed; and that the appellants pay one half of the costs, and the appellees the other half, incurred in this court; which is ordered to he certified to the said circuit court of the county of Culpeper.
Decree reversed.