# Richmond.

W. F. GRANDY, RECEIVER OF THE AMERICAN BONDING
AND CASUALTY COMPANY OF SIOUX CITY, IOWA, A
CORPORATION, APPELLANT v. THE REAL ESTATE
TRUST COMPANY OF PHILADELPHIA; THE PENNSYL-
VANIA COMPANY FOR THE INSURANCE OF LIVES AND
GRANTING ANNUITIES; THE BANK OF NORTH AMER-
ICA AND TRUST COMPANY; AND THE GIRARD TRUST
COMPANY; WASHINGTON-VIRGINIA RAILWAY COM-
PANY; AND A. L. REYNOLDS, RECEIVER OF WASHING-
TON-VIRGINIA RAILWAY COMPANY, APPELLEES.

March 17, 1927.

1. CREDITORS' SUIT—*Receivers—Lien of Execution—Priorities.*—In the in-
   stant case appellant had acquired no lien prior to the appointment
   of a receiver in a creditors' suit against an insolvent railroad. There
   were certain assets in the receiver's hands, cash and other intan-
   gibles, which were not subject to any of the mortgages on the rail-
   road because not within their terms. It was contended that these
   intangibles being incapable of being levied on, were subject to the
   lien of the appellant's execution issued subsequent to the appoint-
   ment of the receiver. The instant case was not merely a suit to
   foreclose the mortgage lien, but was also a general creditors' suit
   against an insolvent corporation. In the decree appointing the
   receiver, the court recognized the superior equity of current unpaid
   labor and supply creditors in the liquid assets then on hand.
   *Held:* That the court took charge of all of the assets of the insolvent
   railroad through its receiver to be administered for the benefit of all
   creditors, as their rights then stood, and that priorities as to debts
   were fixed as of the date of giving bond and taking charge of the
   assets by the receiver, and no creditor could thereafter by individual
   action acquire a lien or a right which had not previously obtained.

2. RECEIVERS—*Priorities—Lien Acquired after Appointment of Receiver.*—
   One who has no lien when a receiver is appointed, although the mere
   right to acquire one may then exist, cannot proceed for that purpose
   by independent action after the appointment of the receiver and
   gain a preference over other creditors, as in the case of the adminis-

tration of insolvent's estates in which creditors are entitled to *pro rata* and equitable distribution. The application of this rule depends upon the nature of the suit in which the receiver is appointed.

3. RECEIVERS—*Priorities—Claim Arising Out of Railroad's Liability as Surety—Bondholders' Priority.*—In a creditors' suit against an insolvent railroad, appellant asserted that his claim against the railroad was entitled to priority over the claims of the bondholders. Appellant's claim arose out of a liability of the railroad company as surety. The suretyship arose out of transactions connected with the extension of the railroad. This extension was undertaken by another corporation in which the railroad was a stockholder. The obligation of the railroad came about from an attempt on the part of the railroad not to purchase rails for its own use, but for the extension. The rails were never used and the extension was never built.

   *Held:* That appellant's claim was not entitled to priority over the bondholders.

4. RECEIVERS—*Priorities—Claim Arising Out of Railroad's Liability as a Surety—Bondholders—Diversion.*—In the instant case, a creditors' suit, appellant claimed priority over the bondholders of an insolvent corporation. Appellant's claim arose out of the suretyship of the railroad incurred in connection with an extension of the railroad by another corporation in which the railroad held stock. There was no possibility of any benefit accruing to the bondholders from any part of the transaction in reference to the extension out of which the railroad's liability as surety arose. Appellant based his claim for priority on the ground of diversion of funds of the railroad to his detriment by payments made by the railroad during the pendency of the creditors' suit—payments of interest to the bondholders—and like payments by the receiver.

   *Held:* That the appellant had no right of priority over the bondholders because of diversion.

5. RAILROADS—*Insolvency—Priorities—Bondholders—Labor and Operating Expenses.*—The right of a bondholder of an insolvent railroad is, because of his lien, paramount unless the principles of right and justice demand that his right be postponed to a right which has accrued since, but which should take precedence over his because of some peculiar equity. This equity must grow out of the fact that the claim is for labor, operating expenses, equipment (current debts made in the ordinary course of business) or out of a transaction that has added to the security of the mortgage or was to his benefit.

6. RAILROADS—*Insolvency—Priorities—Bondholders—Diversion of Railroad Funds.*—When the courts and text writers speak of "diversion" they are speaking of the diversion of gross earnings of a public utility, from the payment of the actual and necessary operating expenses, which are the essentials of any earnings at all, to the payment of some other lien indebtedness ordinarily entitled to only the net earnings,

or to the enhancement of the property which the court has taken into its custody, and will ultimately go to enhance the security of the very persons who have received the benefit of the diversion.

7. RAILROADS—*Insolvency—Priorities—Mortgages and Operating Expenses.*—The right of a court of equity to require the earnings of a receivership to be applied in payment of debts incurred prior to the appointment of the receiver in preference to the claims of mortgagees, has been limited to claims for current expenses incurred in the ordinary course of the operation of the mortgaged property, whether for labor or supplies, including, to some extent, or under some circumstances, necessary equipment and repairs, but excluding debts for original construction, and permanent equipment and improvements. And it must be shown that the demand is not a debt created upon the personal credit of the company, but with the expectation that it was to be met out of current receipts.

8. RAILROADS—*Insolvency—Priorities—Mortgages and Operating Expenses.*—Neither the fact that the consideration of a claim preserved and improved the mortgaged property and increased the security of the mortgage, nor the fact that it was indispensable to keep the mortgagor a going concern, and to continue its business and operation, will give to the claimant a preferential equity over the lien of creditors secured by prior mortgage, but it must be a current expense of the operation of the mortgagor, incurred in the ordinary course of its business within a limited time, usually six months prior to the appointment of the receiver.

9. RECEIVERS—*Diversion—Creditor Whose Claim is Inferior to Bondholders.*—A creditor of an insolvent railroad, whose claim is inferior to that of the bondholders, cannot complain of disbursements by the receiver which are to the prejudice of the bondholders.

Appeal from a decree of the Circuit Court of Fairfax county, in a creditors' suit from a decree denying him a priority. Petitioner appeals.

*Affirmed.*

The opinion states the case.

*J. K. M. Norton* and *Edward L. Ward*, for the appellant.

*Gardner L. Boothe* and *John S. Barbour*, for the appellees.

CHICHESTER, J., delivered the opinion of the court.

The only contest in this litigation is between W. F. Grandy, receiver of the American Bonding and Casualty Company of Sioux City, Iowa, hereafter referred to as appellant, and the mortgage bondholders of the Washington-Virginia Railway Company, which company being insolvent is represented in the litigation by A. L. Reynolds, receiver.

The Washington-Virginia Railway Company, a Virginia corporation (hereafter referred to as the railway company), operated an electric railway from Washington, D. C., to Mount Vernon in Fairfax county. It was heavily mortgaged and it becoming apparent to the bondholders that it was hopelessly insolvent, in the fall of 1923, four separate suits were instituted in the Circuit Court of Fairfax county by creditors (mortgage bondholders, appearing in the caption as appellees), but open to any and all creditors if they desired to participate. On November 23, 1923, these suits were consolidated and A. L. Reynolds was appointed receiver with the usual power in such cases.

On November 6, 1923, litigation involving a claim of $22,649.25 between the appellant and the railway company, which had been pending for a long time and was then pending on appeal in the United States Circuit Court of Appeals, Fourth Circuit (293 F. 695), terminated favorably to appellant, and judgment was docketed on December 17, 1923, for the full amount of the claim. Upon the judgment, executions issued December 22, 1923, April 9, 1924, and January 28, 1925. The executions were all returned "no effects upon which levy could be made."

The appellant, upon petition, became a party to the consolidated suits and contends that his judgment should be paid out of the proceeds of the sale of the mortgaged property.

1. Because of his judgment and executions.
2. Because of diversions.
3. Upon general equitable principles.

The cause was referred to Commissioner George B. Robey who reported against the priority of the judgment of appellant, and upon exceptions being filed, the circuit court overruled the exceptions and confirmed the commissioner's report by decree June 2, 1925. An appeal was allowed from this decree by one of the judges of this court.

The several grounds upon which appellant based his claim of priority in the trial court are urged here as sound and as grounds for reversal of the decree complained of. We will take them up in order.

[1] (1) It will be noted from an examination of the chronological order of events heretofore narrated that appellant had acquired no lien prior to the appointment of the receiver. At that time, however, there were certain assets in the receiver's hands, cash and other intangibles, in the hands of the treasurer at the time of the appointment of the receiver, which were not subject to any of the mortgages because not within their terms, and which the trustees in the mortgages therefore had no title to or right to possession of.

The contention is that these intangibles remained unaffected by the appointment of a receiver, and because intangibles are incapable of being levied on, were subject to the lien of the appellant's execution issued subsequent to the appointment of the receiver, under section 6501 of the Code, and under the decisions of this court in *Frayser's Admr.* v. *R. and A. R. Ry. Co.,* 81 Va. 393, and *Harman* v. *McMullin,* 85 Va. 187, 7 S. E. 349, and other cases.

There are two very vital points in the instant case which differentiate it from the cases relied on and

defeat appellant's claim to a lien on these assets by reason of his judgment.

The first is that the proceeding in the court below was not merely a suit to foreclose the mortgage liens, but was also, especially under the bill of the Bank of North America and Trust Company, a general creditors' bill against a confessedly insolvent corporation for the ascertainment of the rights and equities of all creditors and stockholders in and to its assets, and for the administration thereof for the benefit of all creditors according to their several equities; and

Second, that in the decree appointing the receiver the court recognized the superior equity of current unpaid labor and supply creditors in and to the liquid assets then on hand, and directed the receiver to apply the same to the payment thereof and they were applied probably before the executions were issued, and certainly before the petition was filed. These were equities which would have been applied against the appellant even if he had acquired a lien first, as will later become apparent. *A fortiori* it was properly applied before lien acquired by him.

It is clear from these facts that the court took charge of *all* of the assets of the insolvent railway company, through its receiver, to be administered for the benefit of *all* creditors, as their rights then stood and that priorities as to debts were fixed as of the date of giving bond and taking charge of the assets by the receiver. No creditor in the nature of things could thereafter by individual action acquire a lien or a right which had not previously obtained.

[2] The rule that liens cannot be acquired against an insolvent corporation after the filing of a general creditors bill and appointment of receiver is stated thus in 34 Cyc. 199 (e): "One who has no lien when a

receiver is appointed, although the mere right to acquire one may then exist, cannot proceed for that purpose by independent action after the appointment of the receiver and gain a preference over other creditors, as in the case of the administration of insolvent's estates in which creditors are entitled to *pro rata* and equitable distribution. The application of this rule depends upon the nature of the suit in which the receiver is appointed, and the rule has been held not to apply to a receiver *pendente lite* when the sole object is to preserve the property for the purpose of the decree as between the parties to the suit only, without affecting the interest of third persons as distinguished from a receivership for the general administration of assets as above mentioned." See also pages 231-2; *Hollins v. Brierfield C. & I. Co.,* 150 U. S. 371, 380-382, 14 S. Ct. 127, 37 L. Ed. 1113.

An examination of the cases cited by appellant will show that they contain no holding contrary to this rule, under circumstances such as exist here.

[3] (2) (3). The second and third grounds upon which appellants claim priority of their judgment over the bondholders will be considered together as they involve practically the same question, as upon either ground the right of priority depends upon the superiority of the equity. Stated concisely, the proposition of appellant is that when equity takes charge of railroad property at the instance of bondholders through the trustee, claims such as the appellant's are given priority, both on general equity principles and because of diversion of earnings and assets, where there has been diversion, to payment of interest and principal to bondholders.

It will, of course, be conceded that this is true of some claims, but the question as to whether appellant's

claim is such a claim as is given priority because of its equity or because of diversions, is the question in this case.

Before discussing the law as established by the authorities, it becomes necessary therefore to ascertain the nature of the claims here asserted.

It grew out of the following series of transactions: During the spring of 1918, the railway company wanted to extend its line from Mt. Vernon to Camp Humphries, a military camp in Fairfax county, a distance of four miles. It is claimed by appellant that the United States government brought some pressure to bear upon the company and even made threats that if it did not build the extension to the camp where there were some 30,000 soldiers encamped, the government would take the road over, build the extension and operate it. This latter is denied by the railway company, and in view of the fact that the road was operating at a loss at the time, and taking it over by the government would have been a benefit rather than a detriment, and in view also of the fact that the contract for the purchase of rails for the extension, which is indirectly at the bottom of this controversy, was made about a month after the armistice was signed, we are inclined to accept the position of the railway company that it was not acting under compulsion or threat of the United States government. We do not regard this as very material, however, although much was made of it in the argument by appellant.

At any rate, it appears from the evidence that the railway company, on May 9, 1918, entered into some sort of a contract with one Franklin Helm, to construct the proposed line. The contract is not in evidence and its terms are not known except that it was understood that a new corporation would be formed to make the

extension.   This was done, and on August 21, 1918, the "Mount Vernon and Camp Humphries Railway Company" was incorporated.   The railway company (defendant in error here) owned a large majority of the stock of the new company and controlled it, but there were other stockholders, and the new company entered into the contract with Helm to build the road.

Rail, as was other material at that time, was difficult to get.   Helm, who seems to have been as short of character as he was of cash, claimed to own a railroad in Pennsylvania which had been abandoned and he proposed to sell the rail from this road to the new company.   This rail was not used, however, because it was afterwards ascertained that some rail made in this country for the Russian government, which could not be shipped abroad on account of existing conditions, could be purchased and used on the extension.

But this Russian rail had to be paid for and as all parties interested were short on cash, the following plan was conceived and carried out: Helm, on December 10, 1918, contracted to sell all the rail, etc., on his Pennsylvania road to Hoffman & Company, Incorporated, of Baltimore, Maryland, for $20,000 cash and the balance to be paid as provided in the contract. Thus the parties co-operating in building the extension would get the money to buy the Russian rail.

Hoffman & Company required a bond to secure them in the purchase of the rail, etc., from Helm before putting up the cash, and in order to get a surety company to execute such a bond, Helm and the railway company (appellee) joined in an indemnity bond to the surety company on the same day, December 10, 1918.

This bond recited: "Whereas, we, the undersigned, have requested the Chicago Bonding and Insurance Company * * * to sign and execute a certain

bond or undertaking on behalf of Franklin Helm * * * on bond of twenty thousand dollars to R. C. Hoffman & Company, Incorporated, reference to which bond or undertaking is hereby made for the purpose of certainty. * * *

"And, whereas, the company has signed and executed, or is about to sign and execute, the said instrument upon the condition of the execution and delivery hereof and upon the security and indemnity hereof and herein provided.

"Now, therefore, etc."

The Washington-Virginia Railway having executed the indemnifying bond, the Chicago Bonding and Insurance Company executed its guaranty bond to secure Hoffman & Company, and Helm, thereupon, received the cash payment of $20,000, but he failed to deliver the rails, etc., to Hoffman & Company, as agreed.

On August 7, 1919, Hoffman & Company, not being reimbursed, instituted suit against Chicago Bonding Company on its guaranty bond and recovered judgment.

The railway company, because of its indemnity to Chicago Bonding Company, had its attorney, who was also its president, participate in the trial of this suit.

The railway company directed an appeal from this judgment, and induced the American Bonding and Casualty Company, of Sioux City, Iowa (appellant), to become surety on the appeal bond by executing to the bonding company its indemnifying bond.

This indemnity bond of Washington-Virginia Railway Company recited: That Chicago Bonding Company had "at the request and upon the written indemnity of Washington-Virginia Railway Company, become surety for Helm to Hoffman & Company."

That judgment had been obtained by Hoffman . & Company.

That the railway company, as "indemnitor of Chicago Bonding Company," desired and had directed an appeal from the judgment.

That the American Bonding and Casualty Company had given the appeal bond at the "direction and request" of the Railway Company upon the express condition that the railway company would indemnify the said bonding company.

That the railway company had become indemnitor for Helm, because the said Helm was employed as a contractor to build the proposed road from Mount Vernon to Camp Humphries, and because the railway company was aiding Helm to procure in this transaction with said R. C. Hoffman & Company, Incorporated, the necessary rails and equipment used in the construction of the road.

Then follows the covenant to indemnify the bonding company against the payment of the judgment should it be affirmed on appeal.

The judgment of Hoffman & Company was affirmed and the railway company not paying it, the bonding company was compelled to do so. The American Bonding and Casualty Company failed and appellant was appointed receiver for it. Appellant then brought suit against Washington-Virginia Railway Company which was removed to the United States District Court for the Eastern District of Virginia. By agreement the case was heard by the court without a jury, and judgment entered for defendant. Appellant appealed to the United States Circuit Court of Appeals, 293 F. 695. On November 6, 1923, the Court of Appeals reversed the trial court, entered judgment for appellant against the railway company, and this is the judgment

asserted here as being entitled to priority over the lien of the bondholders.

It will thus be seen that the debt upon which appellant obtained judgment was on account of payment by appellant of the appeal bond upon which the railway company was surety, and the obligation came about through the various stages above set out from an attempt on the part of the railway company not to purchase rail for its own use, but because it originally, jointly with Helm, entered into an indemnity bond so that Hoffman & Company, Incorporated, would put up $20,000 for Helm to purchase Russian rail with which to help build the "Mount Vernon-Camp Humphries Railway" in performance of his contract with the latter company. Helm never accounted for the money, never purchased any rail, and never built the road nor was it ever built. Of course, these facts, although they make the debt a hard one to pay, do not affect the legal obligation of the railway company, but they do have a material bearing on the question of priority of judgment over the lien of the mortgage bondholders, as it is conceded that the entire assets of the railway company are insufficient to meet its bonded indebtedness.

Appellant bases his claim of a diversion to his detriment on payments made by the railway company during all the time these legal controversies were going on, payments of interest to bondholders, and like payments made, subsequent to the appointment of the receiver, by the receiver under direction of the court.

He alleges in his petition for appeal the following as the reason for his contention that the payment of interest to bondholders and other payments of like nature were diversions.

"The nature of appellant's claim on which he

obtained judgment was quite meritorious and one which in the ordinary course of business should have been paid out of earnings, as any other current expense, when it first accrued, certainly early in 1919.   Instead of doing this the earnings were diverted to pay the bond-holders $375,000 interest, allowing $100,000 of taxes to accumulate, which were afterwards paid out of earnings; and whilst appellant's claim was left unpaid, $296,000 was paid out of earnings on cars purchased, which the bondholders claim, prior to receivership, and $63,000 of principal and $9,000.00 of interest since the receiver as appointed.

"Appellant's claim grew out of transactions wherein the railroad company and its contractor, both in financial difficulties, were seeking to get money to purchase rails for a short extension of its line to Camp Humphries, which was demanded by the United States government under threat in war period to take possession of the railroad.

"In other words the obligation was incurred to save the possession of the railroad property to the Washington-Virginia Railway Company and in the interest of the bondholders.

"Under these circumstances appellant contends that his claim should be paid, before the bondholders, out of the earnings, and the proceeds from the sale of the railroad's property, including said cars, and personal assets taken over by the receiver."   If we could concede that all this was done to save the railway property in the interest of the bondholders, as counsel for appellant has concluded, our final conclusions might accord with his, but there was no possibility of any benefit accruing to the bondholders from any part of the transaction, and as a matter of fact it had exactly the opposite effect.

[4] As we view the situation, appellant's claim, while it is an established legal obligation, has no such merit as is claimed for it in the foregoing summary. If this is true, under the decisions it has no right to priority over the bondholders in this case because of diversion or by reason of superior equity.

The general principles in reference to diversion in the technical sense in which we are considering it here, were evolved in the early and leading case of *Fosdick* v. *Schall*, 99 U. S. 236, 25 L. Ed. 339, although the broad rules there laid down have been considerably limited since. In that case, at page 252, this is said: "The business of all railroad companies is done to a greater or less extent on credit * * * and when companies become pecuniarily embarrassed, it frequently happens that debts for labor, supplies, equipment and improvements are permitted to accumulate, in order that bonded interest may be paid and a disastrous foreclosure postponed, if not altogether avoided. In this way the daily and monthly earnings, which ordinarily should go to pay the daily and monthly expenses, are kept from those to whom in equity they belong, and used to pay the mortgage debt. The income out of which the mortgagee is to be paid is the net income obtained by deducting from the gross earnings what is required for necessary operating and managing expenses, proper equipment and useful improvements. Every railroad mortgagee in accepting his security impliedly agrees that the current debts made in the ordinary course of business shall be paid from the current receipts before he has any claim upon the income. If for the convenience of the moment something is taken from what may not improperly be called the current debt fund, and put into that which belongs to the mortgage creditors, it certainly is not inequitable

for the court, when asked by the mortgagees to take possession of the future income and hold it for their benefit, to require as a condition of such an order that what is due from the earnings to the current debt shall be paid by the court from the future current receipts before anything derived from that source goes to the mortgagees. In this way the court will only do what, if a receiver should not be appointed, the company ought itself to do. For even though the mortgage may in terms give a lien upon the profits and income, until possession of the mortgaged premises is actually taken, or something equivalent done, the whole earnings belong to the company and are subject to its control."

[5] It will thus be seen that if the railway company had originally purchased rail for its own line for necessary repairs there would be some ground here to ask that the bondholders be postponed to the rights of those who furnished the rail or those who became surety for the payment for such necessary equipment. But it is plain that no part of the appellant's debt here asserted arose from or is rooted in any such considerations as are required to give it priority. The right of the bondholder is, because of his lien, paramount unless the principles of right and justice demand that his right be postponed to a right which has accrued since, but which should take precedence over his because of some peculiar equity. This equity must grow out of the fact that the claim is for labor, operating expenses, equipment (current debts made in the ordinary course of business), or out of a transaction that has added to the security of the mortgagee or was to his benefit. We must measure the claim here asserted by these standards. Appellant asserts it meets these requirements. We think it does not.

Mr. Helm never did any work for the Washington-

Virginia Railway Company and was never under any obligation to do any. His obligation was to build a line for another corporation in which the Washington-Virginia Railway Company merely held stock, but that line was never built and no portion of it went into the hands of the receiver appointed in this case, nor have any earnings or other property of any kind received from it gone into his hands.

Is there any obligation growing out of such a transaction as the facts here disclose that a bondholder impliedly agrees shall be paid before he shall be paid his interest and principal when he advances his money and takes his lien? If so, we venture, it would be a difficult thing to float railroad bonds.

Again in the *Schall Case, supra,* the court said: "The cars were not included in what was sold at the foreclosure sale and consequently have contributed nothing directly to the fund now in court for distribution."

In the case at bar it is equally true that none of the rail sold by Helm to Hoffman & Company as an advance on the contract ever went into the possession of the Washington-Virginia Railway Company, and it is absolutely certain that none of it ever went directly or indirectly to the hands of the receiver or in any way enhanced the value of its property or advantaged remotely either mortgagees or general creditors of the railway company.

[6] It is clear from what has been said and from the cases hereafter cited, that when the courts and text writers speak of diversion they are speaking of the diversion of gross earnings of a public utility from the payment of the actual and necessary operating expenses which are the essentials of any earnings at all to the payment of some other lien indebtedness ordinarily

entitled to only the net earnings, or to the enhancement of the property which the court has taken into its custody, and will ultimately go to enhance the security of the very persons· who have received the benefit of the diversion.   These fundamental principles are recognized in all the decided cases, and in our opinion exclude the case at bar, not only because the debt asserted here had nothing to do with the furnishing of anything for the railway company itself which enhanced, or so far as the record shows ever would have enhanced, its value from the standpoint of the bondholders, but it was something engaged in by the railway company through its directors, along with others, outside its regular contemplated business, without the knowledge or consent of the bondholders, which helped to precipitate the insolvency and downfall of the company.

The commissioner to whom these consolidated causes were referred in reporting upon appellant's claim said: "The debt claimed by the petitioner is not an operating expense.   It was simply a debt of suretyship and there is nothing in its inception, either in the way of benefit to the creditors of the company or to the public, to arouse a court of equity to activity in its behalf, nor has any evidence been presented to your commissioner to show, or to tend to show, that any funds properly applicable, or that should have been applied to this judgment by the railway company, have been improperly diverted."

[7] The trial court confirmed this report and we are in full accord with the conclusion of the commissioner and the trial court.   This view is sound according to all the authorities.   Their purport is clearly stated in 34 Cyc. 359 (c), where this is said:  "The decisions which have established the right of the court to require

the earnings of a receivership to be applied in payment of debts incurred prior to the appointment of the receiver, in preference to the claims of the mortgagees at whose suit the receiver had been appointed, restrict that right to somewhat, narrow limits.   The broad language of the leading case on the general subject (the *Schall Case, supra*), extending the preference to 'necessary operating and managing expenses, proper equipment, and useful improvements' has been disapproved or modified, and the class of claims entitled to equitable preferences has been limited in some of the later decisions to claims for current expenses incurred in the *ordinary* (italics supplied) course of the operation of the mortgaged property, whether for labor or supplies, including, to some extent, or under some circumstances, necessary equipment and repairs, but excluding debts for original construction, and permanent equipment and improvements.   And it must be shown that the demand is not a debt created upon the personal credit of the company, but with the expectation that it was to be met out of current receipts.''   (The text is supported by a great array of cases.   Note 96.)   "The test of the preferential equity of a claim is its consideration.   If its consideration was a current expense of the operation of the mortgaged property, which inured to its benefit, and which was incurred in the ordinary course of its business, within a limited time anterior to the appointment of the receiver, the claim may be preferred.   *Rodger Ballast Car Co.* v. *Omaha, etc., R. Co.*, 154 Fed. 629, 83 C. C. A. 403; *Illinois Trust, etc., Bank* v. *Doud*, 105 Fed. 123, 44 C. C. A. 389, 52 L. R. A. 481.''   The claim asserted here does not meet these tests.   As stated above, recent decisions have limited rather than enlarged the preferences indicated under the broadly stated rules

announced in *Fosdick* v. *Schall, supra.* Mr. Fletcher in his work on corporations, vol. 8, section 5403, page 9000, says: "Later decisions of the Federal courts, concurred in by the State courts, limit the broad language of the leading case of *Fosdick* v. *Schall* extending the preferences to 'within necessary operating and managing expenses, proper equipment and useful improvements, so as to exclude *inter alia* debts for original construction and for permanent equipment and improvements."

These later decisions follow the Virginia court in *Addison* v. *Lewis,* 75 Va. 701.

As stated by Mr. Justice Harlan in *So. Ry. Co.* v. *Carnegie Steel Co.,* 176 U. S. 257, 296, 20 S. Ct. 347, 362 (44 L. Ed. 458): "It should reasonably appear from all the circumstances, including the amount involved and the terms of payment, that the debt was one fairly to be regarded as part of the operating expenses of the railroad, incurred in the ordinary course of business and to be met out of current receipts."

[8] Or as stated by Mr. Fletcher in the same section, and sustained by an ample array of authority: "Neither the fact that the consideration of a claim preserved and improved the mortgaged property and increased the security of the mortgage, nor the fact that it was indispensable to keep the mortgagor ·a going concern, and to continue its business and operation, will give to the plaintiff a preferential equity over the lien of creditors secured by prior mortgage, but it must be 'a current expense of the operation of the mortgagor, incurred in the ordinary course of its business within a limited time, usually six months prior to the appointment of the receiver.' "

The appellant's claim could not be made to come within any of these requirements.

[9] The funds that went into the hands of the receiver were used under the direction of the court for the most part, at least, to pay claims that did meet this test, but if any of those claims did not meet the test the bondholders, who have preference over the appellant here, are injured and not the appellant.

The bondholders, under the express terms of the trust deed, with the exceptions noted because of the peculiar equity of their claims, are entitled, in case of insolvency and the appointment of a receiver, to have the receiver take charge of *all* the property of the railway company including the tolls, income and revenue thereof for the primary benefit of the trustee and holders of bonds thereby secured. (See Mortgage—Washington-Virginia Railway Company to Pennsylvania Company, article 4, sections 2 to 11.)

The appellant cannot complain of these disbursements. *Frayser* v. *R. & A. Ry.*, 81 Va. 393.

One case cited and relied on by the appellant (*Union Trust Co.* v. *Morrison,* 125 U. S. 591, 8 S. Ct. 1004, 31 L. Ed. 825) warrants discussion because of the apparent similarity of facts to the case at bar, but an examination of that case shows that the decision was based upon the equities of the intervenor's claim arising from action taken at the instance of mortgagees; reservation in the decree giving the receiver the right to pay this claim; the acquiescence of the mortgagees therein and the discretionary power of the court below which had not been abused. It expressly negatived any purpose to depart from the rules laid down in *Fosdick* v. *Schall, supra,* or *Huidekoper* v. *Locomotive Works,* 99 U. S. 258, 25 L. Ed. 344, the court, after stating all these special grounds, said: "The case is a special one, and in view of the discretion which the court of first instance is obliged to exercise in matters

of this character taking all the circumstances into consideration, we cannot say that equitable relief was unduly extended in allowing intervenor's claim."

After referring to the cases just cited, the court continued: "All we then decided and all we decide is that if current earnings are used for the benefit of mortgage creditors before current expenses are paid, the mortgage security is chargeable in equity with restoration of the fund which has been thus improperly applied to their use.   *   *   *   The present claim is of a different character based upon a *bona fide* effort made by the intervenor to preserve the fund itself from waste and spoliation after the mortgage was in arrears and the right to reduce to possession had accrued."

None of the essential facts upon which the equities in that case were based appear in the case at bar.

Our conclusion is that there is no equity in appellant's claim which entitled him to preference over the bondholders, and that there is no error in the decree of the circuit court complained of.

*Affirmed.*